Lesley E. Weaver (SBN 191305)
Matthew S. Weiler (SBN 236052)
Emily C. Aldridge (SBN 299236)
BLEICHMAR FONTI & AULD LLP
1999 Harrison Street, Suite 670
Tel: (415) 445-4003
E-mail: lweaver@bfalaw.com
E-mail: mweiler@bfalaw.com
E-mail: ealdridge@bfalaw.com

*Counsel for Steven Lewis, Travis Burton, and the Proposed Classes*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN LEWIS and TRAVIS BURTON, Plaintiffs, on behalf of themselves and other similarly situated,<br><br>v.<br><br>BMW AG, BMW NORTH AMERICA, LLC, VOLKSWAGEN AG, VOLKSWAGEN GROUP OF AMERICA, INC., AUDI AG, AUDI OF AMERICA, INC., AUDI OF AMERICA, LLC, DR. ING. H.C.F. PORSCHE AG, PORSCHE CARS OF NORTH AMERICA, INC., DAIMLER AG, MERCEDES-BENZ USA, MERCEDES-BENZ VANS, LLC, MERCEDES-BENZ U.S. INTERNATIONAL, ROBERT BOSCH GMBH, and ROBERT BOSCH LLC, Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

# TABLE OF CONTENTS

I.  NATURE OF THE ACTION .................................................................................. 1

II.  JURISDICTION AND VENUE ........................................................................... 6

III.  PARTIES ............................................................................................................ 7

IV.  DEFENDANTS' AGREEMENTS TO LIMIT COMPETITION IN THE
MARKET FOR GERMAN AUTOMOBILES ................................................. 13

V.  COLLUSION OF THE CIRCLE OF FIVE RELATING TO EMISSION
CONTROL SYSTEMS ...................................................................................... 14

VI.  AGREEMENT TO LIMIT TECHNOLOGIES OTHER THAN EMISSIONS
CONTROL SYSTEMS ...................................................................................... 21

VII.  DEFENDANTS TARGETED MARKETING AND SALES TO U.S.
CONSUMERS ................................................................................................... 23

VIII.  EACH DEFENDANT MET WITH U.S. REGULATORS TO OBTAIN
PERMISSION TO SELL VEHICLES IN THE UNITED STATES ................. 30

IX.  THE MARKET FOR GERMAN AUTOMOBILES ........................................ 32

X.  DEFENDANTS' HISTORY OF COLLUSION AND WRONGDOING ......... 33

XI.  TOLLING OF THE STATUTE OF LIMITATIONS ...................................... 38

XII.  CLASS ALLEGATIONS ................................................................................. 39

XIII.  COUNTS ........................................................................................................... 42

(A)  COUNT I – VIOLATION OF SECTION I OF THE SHERMAN ACT, 15
U.S.C. § 1 .......................................................................................................... 42

(B)  COUNT II – VIOLATIONS OF THE CARTWRIGHT ACT, CAL. BUS. &
PROF. CODE § 16720,  AND VIOLATIONS OF OREGON REVISED
STATUTES § 646.705 ET SEQ. ....................................................................... 43

(C)  COUNT III – VIOLATIONS OF THE CALIFORNIA UNFAIR
COMPETITION LAW,  CAL. BUS. & PROF. CODE § 17200 ET SEQ. ....... 44

XIV.  PRAYER FOR RELIEF ................................................................................... 45

XV.  JURY DEMAND ............................................................................................... 46

Plaintiffs Steven Lewis and Travis Burton, on behalf of themselves and all others similarly situated, hereby allege the following, based solely on personal knowledge, information and belief, the investigation of counsel, expert analysis, and public sources.  Plaintiffs' investigation is ongoing and details of the expansive cartel described herein continue to be revealed, despite the participants' efforts to keep them confidential.  Prosecutors in the European Union, Germany, and the United States are investigating as well.  For these reasons, Plaintiffs specifically reserve the right to amend and to add additional facts, claims, parties, and co-conspirators.

Plaintiffs bring this class action for damages and injunctive relief, and other relief pursuant to the federal and state antitrust laws.

## I.    NATURE OF THE ACTION

1.    This action arises out of a vast, twenty-year conspiracy by the largest and most profitable German automobile manufacturers—Audi, BMW, Daimler, Porsche, and Volkswagen (together, "Manufacturer Defendants")[1]—which was intended to, and did, create the perception of innovation and competition among them, while in fact they agreed to eliminate or severely curtail competition.  These coordinated actions enabled the Manufacturer Defendants—the self-named "Fünfer-Kreise," or Circle of Five—to impose a German automobile premium on consumers premised on superior German engineering, while secretly stunting incentives to innovate.  Indeed, as one commentator noted, the Circle of Five acted at times in greater coordination than divisions within each Manufacturer Defendant company.  Bosch, as a key supplier to the Manufacturer Defendants, played a critical role in enabling and concealing the cartel, also profiting enormously from it.[2]

2.    The conspiracy described herein allowed Defendants to market German automobiles in the United States and charge premium prices for supposedly "cutting edge" technological innovations that

---

[1]    The "Manufacturer Defendants" are Volkswagen AG, Volkswagen Group of America ("Volkswagen" or the "Volkswagen Defendants" or the "VW Defendants"); Audi AG, Audi of America, Inc., and Audi of America, LLC ("Audi" or the "Audi Defendants"); Dr. Ing. H.c.F. Porsche AG and Porsche Cars North America ("Porsche" or the "Porsche Defendants); Daimler AG, Mercedes Benz USA, Mercedes-Benz U.S. International, Inc., Mercedes-Benz Vans LLC ("Daimler" or the "Daimler Defendants"); Bayerische Motoren Werke AG and BMW of North America KKC ("BMW" or the "BMW Defendants").

[2]    The "Bosch Defendants" are Robert Bosch LLC and Robert Bosch GmbH.  The "Defendants" are the Manufacturer Defendants and the Bosch Defendants.

were promised but not delivered.[3]  The scope of the cartel was immense; Defendants' efforts to keep the facts from the public, even in the face of the related and highly public "Dieselgate" conspiracy, were considerable.  For purposes of this Complaint, "German Automobile" refers to any German passenger vehicle leased or sold in the United States during the time of the Defendants' conspiracy, or from 1996 to at least 2017 (the "Class Period").

3.      For example, Volkswagen ("VW") has long touted "German Engineering" as the key difference between its cars and those of its competitors.  The truth was quite different.  Beginning at least in 1996, Defendants negotiated clandestine, exclusive agreements and shared information with each other about the development of their vehicles, costs, suppliers and markets.  Accordingly, Defendants' sales of automobiles sold in the United States, its territories, and the District of Columbia were done in violation of Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1) and certain states' antitrust laws, including the Cartwright Act.

4.      The commencement of this conspiracy is not coincidental.  The conspiracy alleged herein was initiated in or around 1996, at a time when Japanese automotive manufacturers were dominating U.S. markets.  The German Defendants lagged behind the Japanese automotive manufacturers in the 1990s, and the Circle of Five sought to reverse this trend, meeting hundreds of times to exchange competitively sensitive information about costs, technologies, and virtually every important element of design and manufacture of German Automobiles.

5.      Meeting through working groups, or "Arbeitskreise," of the Verband der Automobilindustrie ("VDA"), or German Automobile Association, in Germany and worldwide, engineers at each of these companies reached secret agreements with each other to limit technological innovation and to share competitively sensitive commercial information about the key aspects of Defendants' design and manufacture of automobiles.  These working groups include "propulsion systems," "structure/bodywork," "chassis," "electrical systems/electronics," and "whole vehicle," all

---

[3]      The "Diesel Premium" refers to inflated prices paid by purchasers or lessees of diesel vehicles manufactured and sold by the Circle of Five during the Class Period.  The "German Premium" refers to inflated prices paid by purchasers or lessees of gas vehicles manufactured and sold by the Circle of Five during the Class Period.  It is possible that consumers may have paid both the Diesel Premium and the German Premium.

technologies central to the superiority of the German market brand of the Circle of Five in engineering and design.

6.      Meetings at which illegal agreements were brokered occurred via teleconferences, email and in-person meetings at company headquarters, roadshows, auto shows, and meetings of other organizations, including but not limited to the German Abgaszentrum der Automobilindustrie ("ADA"). The ADA is in effect a trade organization focusing on emissions control systems.  The motto of the ADA is to work in "pre-development in the field of exhaust gas aftertreatment on petrol and diesel engines in passenger cars."[4]

7.      These were not isolated meetings; they began as early as 1996 and continued until at least 2014, when Daimler first secretly reported to German authorities that it had engaged in such a cartel, seeking leniency from the German government by stepping forward.  On July 4, 2016, Volkswagen AG filed a proffer admitting it had participated in "suspected antitrust violations."  Volkswagen submitted an additional statement to Germany's Federal Cartel Office earlier this week.

8.      There is an active investigation by the European Commission ("EC") concerning the sprawling conspiracy.  On June 23, 2016, the German Federal Cartel Office raided the offices of six companies, including some Defendants, in investigating a steel cartel.  That probe appears to relate to Defendants' collusion to extract price concessions from steel manufacturers.

9.      The German media has reported that Volkswagen informed the EC that Defendants met in "over 60 working groups" of the VDA, many in which Defendants shared competitively sensitive information with each other, supposedly their closest competitors.[5]  Volkswagen has admitted that "in the past five years, over 1,000 meetings took place."[6]

10.      Based upon Plaintiffs' counsel's investigation, a key meeting in the development of the cartel occurred on April 5, 2006.  According to minutes of that meeting, representatives from each

---

[4]      ABGASZENTRUM DER AUTOMOBILINDUSTRIE, http://www.abgaszentrum.de/karriere.html (last visited July 27, 2017).

[5]      Frank Dohmen, Dietmar Hawranek, *Das Auto-Syndikat*, DER SPIEGEL, 30/2017, at 12, *available at* https://magazin.spiegel.de/SP/2017/30/152270400/index.html (subscription only) (last visited July 27, 2017) (hereinafter "*Das Auto-Syndikat*").

[6]      *Id.*

CLASS ACTION COMPLAINT

Manufacturer Defendant, including directors of various divisions, met to discuss the size of urea tanks, which hold emissions-neutralizing agents.  It was specifically discussed in this meeting that the Manufacturer Defendants all wished to reduce costs associated with having different sizes of urea tanks. In a startling development, it appears that these agreements to restrict tank size—which was calculated at the time to save 80 euros per vehicle—were the impetus for the creation of the "defeat device" that was the subject matter of the litigation in *In re: Volkswagen "Clean Diesel" Marketing, Sales Practices and Product Liability Litigation*, Case No. 3:15-md-02672 (referred to herein as "Dieselgate").

11. Based upon Plaintiffs' counsel's investigation in this action, a key component of the cartel alleged herein was the restriction of suppliers.  In secret, closed meetings, the Manufacturer Defendants identified certain key suppliers—such as Robert Bosch GmbH—that would supply the Five with a specific product.  Suppliers not selected were damaged by failure to participate in the market.

12. One component of the cartel was capping costs and limiting innovation in emissions control systems.  For example, as explained in detail below, Defendants agreed to limit tank size for emissions-neutralizing agents (for example, AdBlue) in the European Union and the United States. Such agreements clearly inhibit innovation in the field of emissions controls.  After a meeting of Daimler, BMW, Audi, Volkswagen, and Bosch on October 19, 2006, a VW manager wrote, "Everybody wants a limitation" of the AdBlue injection "because of the limited size of the urea tank.  No one wants to report the real motivation of this limitation to the authorities (CARB, EPA)."  There can be no mistake that the cartel was thus aimed at California and the United States and that Bosch knowingly participated in it.

13. Audi's board of directors convened on April 1, 2010 in Ingolstadt, Germany, for a meeting that reflects Defendants' agreement to restrict innovation in emissions technology.  The meeting was attended by Rupert Stadler, Audi CEO and Chair of the Audi Board of Management.  At the meeting, there was a presentation called "Clean Diesel Strategie:  SCT Tankstrategie & AdBlue Infrastruktur."  Through investigation of the undersigned counsel, this presentation—originally made available to the German antitrust cartel office (Bundeskartellamt)—supports these allegations and excerpts are reproduced herein.  This document clearly reflects horizontal agreement by the

Manufacturer Defendants to limit technological innovation in diesel emission controls driven by the cost of complying with European and U.S. emissions standards.

14.     Emissions control systems were but one aspect of the cartel.  Among the technological innovations inhibited by agreement was the operation of the roofs of convertibles.  Specifically, Defendants agreed that they would not design convertible roofs that could be opened while vehicles were traveling at speeds greater than 50 kilometers per hour.  Other affected technologies include suspension, electronic systems, body design, transmission, and brakes.  Additionally, Defendants shared confidential information about their experiences with specific suppliers and agreed on specific suppliers for given markets.  Defendants also shared sensitive technical data, including testing results for specific products.  Upon information and belief, sometimes Manufacturer Defendants would forego testing altogether, instead relying on the testing of its supposed competitor.  Minutes for VDA working group meetings reflect these illegal agreements.

15.     At minimum, the conspiracy alleged herein enabled one of the greatest frauds ever perpetuated on U.S. consumers and regulators.  As revealed in the "Dieselgate" litigation, Volkswagen used technology and test results it obtained from its competitors in order to create a "defeat device" that inflicted serious damage on the U.S. and worldwide environment.  Volkswagen pled guilty to charges it conspired to defraud the United States and VW's U.S. customers and to violate the Clean Air Act by lying and misleading the Environmental Protection Agency ("EPA"), the California Air Resource Board ("CARB"), and U.S. customers "about whether certain VW, Audi and Porsche branded diesel vehicles complied with U.S. emissions standards, using cheating software to circumvent the U.S. testing process and concealing material facts about its cheating from U.S. regulators."[7]  Similar allegations have been levied against Daimler/Mercedes-Benz and are the subject of an ongoing U.S. Department of Justice investigation.

16.     Defendants have long pointed to their engineering acumen and innovative technology as a way of differentiating their automobiles to U.S. consumers.  During the Class Period, German

---

[7]     Press Release, Department of Justice Office of Public Affairs, Volkswagen AG Agrees to Plead Guilty and Pay $4.3 Billion in Criminal and Civil Penalties (Jan. 11, 2017), *available at* https://www.justice.gov/opa/pr/volkswagen-ag-agrees-plead-guilty-and-pay-43-billion-criminal-and-civil-penalties-six (last visited July 27, 2017).

Automobiles sold in the United States were differentiated products and consumers paid premiums for diesel engines and German engineering.  The Circle of Five exercised market power in the United States, and German Automobiles commanded these premiums premised on the concept of superior technology and innovation.  By suppressing technology amongst themselves, Defendants restricted consumers' choices of vehicles and associated technologies while imposing a premium price for technology they were not providing.  The Manufacturer Defendants also harmed competitor suppliers by working with only selected suppliers.  As a result, consumers paid inflated prices for German Automobiles.

## II.    JURISDICTION AND VENUE

17.    Jurisdiction exists under Section 16 of the Clayton Act (15 U.S.C. § 26) to recover equitable relief for violation of Section 1 of the Sherman Act (15 U.S.C. § 1).  The Court has original federal question jurisdiction over the Sherman Act claim asserted in this complaint pursuant to 28 U.S.C. § 1331 and Section 16 of the Clayton Act.

18.    Plaintiffs also assert claims for actual and exemplary damages pursuant to California and Oregon state antitrust, unfair competition, and consumer protection laws, and seek to obtain restitution, recover damages, and secure other relief against the Defendants for violations of those state laws.  The Court has jurisdiction over these claims under 28 U.S.C. § 1337.

19.    Venue is proper in this District under Sections 4(a) and 12 of the Clayton Act (15 U.S.C. §§ 12 and 22), and 28 U.S.C. § 1391(b), (c), and (d) because Defendants regularly transact business in this District.  Additionally, a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.  Specifically, Defendants participated in trade meetings, car shows, conventions, and other events in California and this District.  Additionally, Defendants have sold hundreds of millions of dollars of German Automobiles in this District since the 1990s.

20.    This Court has jurisdiction over Defendants because the wrongdoing alleged herein was directed at consumers in the United States and in this District.  Defendants conspired to evade emissions standards imposed by United States and California regulators.  As alleged in further detail below, Defendants misled United States customers and regulators alike.

### III.   PARTIES

**PLAINTIFFS**

21.     Plaintiff Steven Lewis (for purposes of this Complaint, "Plaintiff Lewis," and, together with Plaintiff Burton, "Plaintiffs"), an active duty member of the U.S. Air Force who maintains a legal residence in Mississippi and currently lives in Fairfield, California, bought a 2010 BMW 335i on or about April 17, 2013 at Stevens Creek BMW, an authorized BMW dealer in Santa Clara, California. Plaintiff Lewis financed the purchase of his car through Stevens Creek BMW.

22.     Plaintiff Travis Burton (for purposes of this Complaint, "Plaintiff Burton"), a member of the Air National Guard who maintains a legal residence in Oregon and currently lives in Tucson, Arizona, bought a 2014 BMW 328d in or about September 2013 at Kuni BMW, an authorized BMW dealer in Beaverton, Oregon.

23.     As alleged in further detail below, Plaintiffs were injured by paying inflated prices for German Automobiles.  Plaintiffs paid a premium for their German Automobiles that were marketed as having advanced German technology and paid a separate premium for diesel engines.  The premium paid by Plaintiffs reflected Defendants' ability to price German Automobiles as though Defendants competed to deliver cutting edge technology when, unbeknownst to Plaintiffs, they did not.

**DEFENDANTS**

**THE VOLKSWAGEN DEFENDANTS**

24.     Defendant Volkswagen AG is a German corporation with its principal place of business in Wolfsburg, Germany.  Volkswagen AG is one of the largest automobile manufacturers in the world and is in the business of designing, developing, manufacturing, and selling automobiles.  Volkswagen AG is the parent corporation of Volkswagen Group of America, Inc., Audi AG, and Porsche AG.  In 2016, Volkswagen AG was the largest auto manufacturer in the world.  Volkswagen AG's revenues in 2016 were more than $217 billion.  During the Class Period, Volkswagen AG was continuously doing business through a chain of distributors and dealers in the United States, including within this District, by advertising, promoting, distributing, and selling Volkswagen cars and those of Volkswagen's subsidiaries.

25.     Defendant Volkswagen Group of America, Inc. ("VW America," and, together with Volkswagen AG, "Volkswagen" or the "Volkswagen Defendants") is a New Jersey corporation with its principal place of business in Herndon, Virginia.  VW America conducts business in all fifty of the United States and the District of Columbia.  During the Class Period, VW America advertised, promoted, distributed, and sold certain vehicles at issue in this Complaint through the United States, including in this District.

26.     The Volkswagen Defendants designed and sold the vehicles at issue in this action specifically for sale in the United States and to appear to meet United States and California standards regarding emissions compliance and other regulations.

**THE AUDI DEFENDANTS**

27.     Defendant Audi AG is based and incorporated in Germany with its principal place of business in Ingolstadt, Germany.  Audi AG is the parent company of Audi of America, Inc. and Audi of America, LLC (together, "Audi" or the "Audi Defendants").  Audi AG is a subsidiary of the Audi Group, which is a wholly owned subsidiary of Volkswagen AG.  Audi AG directs the operations of Audi of America, Inc. and Audi of America, LLC, which act as its agents in the United States.  Audi AG is a wholly owned subsidiary of Volkswagen AG.  Audi AG designed, developed, advertised, promoted, manufactured, distributed, and sold certain of the vehicles at issue that were purchased throughout the United States, including this District during the Class Period.

28.     Defendant Audi of America, Inc. is a New Jersey corporation doing business in every state and the District of Columbia, with its principal place of business at 2200 Ferdinand Porsche Drive, Herndon, Virginia 20171.  During the Class Period, Audi of America, Inc. was continuously doing business through a chain of distributors and dealers in the United States, including within this District, by advertising, promoting, distributing, and selling Audi cars.

29.     Defendant Audi of America, LLC is a Delaware corporation doing business in every state and the District of Columbia, with its principal place of business at 2200 Ferdinand Porsche Drive, Herndon, Virginia 20171.  Audi of America, LLC is a wholly owned United States subsidiary of Audi AG that engages in business, including the advertising, marketing, and sale of Audi automobiles, in all fifty states.

CLASS ACTION COMPLAINT

**THE PORSCHE DEFENDANTS**

30.     Defendant Dr. Ing. h.c. F. Porsche AG ("Porsche AG") is a German corporation with its principal place of business located in Stuttgart, Germany.  Porsche AG is a wholly owned subsidiary of Volkswagen AG.  Porsche AG designed, developed, manufactured, and sold certain of the vehicles at issue that were purchased throughout the United States, including this District, during the Class Period.

31.     Defendant Porsche Cars North America, Inc. (together with Porsche AG, "Porsche" or the "Porsche Defendants") is incorporated in Delaware with its principal place of business in Georgia. Porsche Cars North America, Inc. is a wholly owned U.S. subsidiary of Porsche AG and advertises, markets, and sells its vehicles in all fifty of the United States.  There are 189 United States Porsche dealers operating under Porsche Cars North America, Inc.

**DEFENDANT DAIMLER**

32.     Defendant Daimler AG ("Daimler") is a foreign corporation headquartered in Stuttgart, Germany.  Daimler designed, engineered, manufactured, tested, marketed, supplied, sold, and distributed certain of the vehicles at issue in this Complaint that were purchased throughout the United States, including in this District, during the Class Period.  During the Class Period, Daimler was continuously doing business through a chain of distributors and dealers in the United States, including within this District, by selling, advertising, promoting and distributing Mercedes-Benz cars.  Daimler also developed, reviewed, and approved the marketing and advertising campaigns designed to sell the Mercedes-Benz automobiles at issue.  Through its wholly owned subsidiaries and agents, Daimler markets its products in a continuous manner in the United States, including in this District.

33.     Daimler controls its subsidiary Mercedes-Benz USA, LLC, which is the sole distributor for Mercedes-Benz vehicles in the United States.  Daimler owns 100% of the shares in Mercedes-Benz USA, LLC.

**THE MERCEDES-BENZ DEFENDANTS**

34.     Defendant Mercedes-Benz USA, LLC ("Mercedes-Benz USA") is a Delaware limited liability corporation with its principal place of business at 303 Perimeter Center North, Suite 202, Atlanta, Georgia 30346.  Mercedes-Benz USA's related companies designed, manufactured, marketed,

CLASS ACTION COMPLAINT

distributed, and sold the vehicles at issue throughout the United States, including in this District during the Class Period.

35.     Defendant Mercedes-Benz U.S. International, Inc. is an Alabama corporation with its principal place of business in Vance, Alabama.  Mercedes-Benz U.S. International, Inc. is a wholly owned subsidiary of Daimler.

36.     Defendant Mercedes-Benz Vans, LLC (together with Mercedes-Benz USA and Mercedes-Benz U.S. International, Inc., "Mercedes-Benz" or the "Mercedes-Benz Defendants") is a Delaware limited liability corporation with its principal place of business in Ladson, South Carolina. Mercedes-Benz Vans, LLC is a wholly owned U.S. subsidiary of Daimler.

**THE BMW DEFENDANTS**

37.     Defendant Bayerische Motoren Werke AG ("BMW AG") is a German vehicle, motorcycle, and engine manufacturer headquartered in Germany.  With its subsidiaries, BMW AG develops, manufactures, and sells cars and motorcycles worldwide, including certain of the vehicles at issue in this Complaint, which were purchased in this District and throughout the United States during the Class Period.  BMW AG's revenue in 2016 was €94.16 billion (approximately $110 billion).  BMW AG's earnings before interest and taxes (EBIT) in 2016 was €9.39 billion (approximately $11 billion).

38.     Defendant BMW of North America, LLC ("BMW of North America" and, together with BMW AG, "BMW" or the "BMW Defendants") is a Delaware limited liability corporation.  BMW of North America's Corporate Headquarters, Eastern Regional Headquarters, and Technical Training Center are located in Woodcliff Lake, New Jersey.  A BMW of North America Regional Distribution Center is in Nazareth, Pennsylvania.  BMW of North America was established in 1975 as the United States importer of BMW vehicles.  BMW of North America assumed import and distribution responsibilities for BMW motorcycles in 1980 and began to distribute light trucks in 1999.

**THE BOSCH DEFENDANTS**

39.     Robert Bosch GmbH is a German multinational engineering and electronics company headquartered in Gerlingen, Germany.  Robert Bosch GmbH, directly and/or through its North American subsidiary Robert Bosch LLC, designs, manufactures, develops, and supplies automotive technology.

40.     Robert Bosch LLC (together with Robert Bosch GmbH, "Bosch" or the "Bosch Defendants") is a Delaware limited liability company with its principal place of business in Farmington Hills, Michigan.  Robert Bosch LLC is wholly owned and controlled by Robert Bosch GmbH.  Robert Bosch LLC worked in conjunction with Robert Bosch GmbH to design, manufacture, develop, and supply automotive technology to the Manufacturer Defendants for use in the vehicles at issue.  Upon information and belief, Bosch was a preferred supplier of the cartel.  As set forth herein, Bosch played a key role in the development of the illegal defeat device, and was aware of the agreement to limit the size of urea tanks as early as October 2006, if not before.

## AGENTS AND CO-CONSPIRATORS

### THE IAV CO-CONSPIRATORS

41.     Each Defendant acted as the principal of or agent for the other Defendant with respect to the acts, violations, and common course of conduct alleged herein.

42.     Defendant IAV Automotive Engineering, Inc. ("IAV-AE") is a Michigan corporation with its principal place of business in Northville, Michigan.  IAV-AE is a United States subsidiary of IAV GmbH.  Defendants Audi, Bosch, and Volkswagen are clients of IAV-AE.

43.     Defendant IAV GMBH is the parent corporation of IAV-AE (together, with IAV-AE, "IAV" or the "IAV Co-Conspirators").  IAV GmbH is a privately held engineering company that is headquartered in Berlin, Germany.  Volkswagen AG holds a 50% ownership share of IAV GmbH.[8]  IAV GmbH specializes in powertrain, electronic, and vehicle development and has at least three offices and one subsidiary in the United States.  Defendants Bosch, Audi, and Volkswagen are clients of IAV GmbH.

44.     The IAV Co-Conspirators collaborated closely with Circle of Five manufacturers and Bosch to develop software used in engine control units, and were key players in the development of the defeat devices at Audi, Porsche, and Volkswagen.  As part of a fraud investigation by the German public prosecutor in Braunschweig, Germany, at least 37 offices and private homes in Wolfsburg,

---

[8]     The other entities that own IAV GmbH and their respective shares are as follows: Continental Automotive GmbH (20%), Freudenberg & Co. KG (10%), Schaeffler Technologies AG & Co. KG (10%), and SABIC Innovative Plastics B.C. (10%).

Braunschweig, and Gifhorn were searched in the week of January 23, 2017.  According to the German Press Agency, the raids were aimed in part at IAV, which is based in Gifhorn.

### THE VDA CO-CONSPIRATORS

45.    On information and belief, at all relevant times, other entities and/or persons, including but not limited to the VDA, willingly conspired with the Manufacturer Defendants in their unlawful restraint of trade.  All averments herein against Defendants are also against these unnamed co-conspirators.

46.    The VDA is an "eingetragener Verein," or registered association or incorporated association, with its headquarters in Berlin, Germany.[9]  The VDA consists of more than 620 companies involved in production for the automotive industry in Germany.  The members are divided into three manufacturer groups: automobile manufacturers, automotive suppliers, and companies that make trailers, special bodies, and buses.

47.    The VDA currently has about 35 working groups, or Arbeitskreise, some of which have sub-committees or ad hoc working groups.  The VDA working groups work towards a common purpose and the majority of the working groups consist of members of all three manufacturer groups.  The working groups include: Aftermarket Committee; Working Group for Container Standardization; Working Group of Manufacturer Group II; Working Group for CAD/CAM; Working Group Digital Factory; Working Group for Electrical Engineering; Working Group for Trade of Manufacturer Group III; Working Group for Refrigerants; Press Committee; Legal Committee; Raw Materials Committee; and Committee for Technology, Safety and the Environment, among others.

48.    Upon information and belief, certain VDA working group meetings provided Defendants the opportunity to conspire and collude by agreeing to restrict developments, limit cost, and/or curtail competition among suppliers.  Each member of these groups had the opportunity to discuss sensitive commercial information, including price, cost, and supplies.  German media reports suggest they did just that.

---

[9]    COMMON REGISTER PORTAL OF THE GERMAN FEDERAL STATES, https://www.handelsregister.de/rp_web/welcome.do (last visited July 27, 2017).

49.     For example, on June 15, 2009, the Circle of Five's senior leaders met.  Among the topics discussed was developing a coordinated strategy among OEMs (original equipment manufacturers) to develop a European infrastructure to service AdBlue tanks under the guidance of the VDA.

50.     Upon information and belief, the cartel involved numerous other persons, partnerships, sole proprietors, firms, corporations, and individuals not named as defendants in this lawsuit. Individuals, the identities of which are presently unknown, have participated as co-conspirators with the Defendants in the offenses alleged in this Complaint, and have performed acts and made statements in furtherance of the conspiracy or in furtherance of the anticompetitive conduct.

## IV.     DEFENDANTS' AGREEMENTS TO LIMIT COMPETITION IN THE MARKET FOR GERMAN AUTOMOBILES

51.     Defendants first met to exchange commercially sensitive information in 1996 and have met "at least" 1,000 times since then.[10]  According to public reports, industry group meetings that may have facilitated collusion involved 200 personnel and 60 working groups, and included engineering personnel and managers from each Defendant.[11]

52.     The scope of the information exchanged is broad.  Volkswagen has admitted to the EC that "Daimler, BMW, Volkswagen, Audi and Porsche made agreements 'for many years, at least since the 1990s, up to today' about the development of their vehicles, costs, suppliers and markets."[12] According to Reuters, Volkswagen has informed the EC that Defendants "discussed vehicle development, brakes, petrol and diesel engines, clutches and transmissions as well as exhaust treatment systems."[13]

53.     During the course of the instant conspiracy, Defendants exchanged confidential information concerning their development of diesel engines and the emissions control systems required

---

[10]     *Das Auto-Syndikat*.

[11]     *German Automakers May Have Colluded Over Diesel Emissions Treatment Systems – Spiegel*, REUTERS (July 21, 2017, 5:15 AM), http://www.reuters.com/article/germany-emissions-cartel-idUSL5N1KC39X (last visited July 27, 2017).

[12]     *Das Auto-Syndikat*.

[13]     *German Automakers May Have Colluded Over Diesel Emissions Treatment Systems – Spiegel*, REUTERS (July 21, 2017, 5:15 AM), http://www.reuters.com/article/germany-emissions-cartel-idUSL5N1KC39X (last visited July 27, 2017).

to obtain certification, which allowed the sale of the vehicles in the United States and in each state. Defendants marketed diesel engines as a "clean" alternative to gasoline-burning vehicles. This is in addition to conspiring about other technologies.

## V. COLLUSION OF THE CIRCLE OF FIVE RELATING TO EMISSION CONTROL SYSTEMS

54. The path that lead to the development of the illegal devices at issue in Dieselgate began with the conspiracy hatched by the Circle of Five to agree upon the size of urea tanks and injection amounts. In other words, Dieselgate was merely one outgrowth of the cartel alleged here.

55. Urea tanks were a solution to the problem caused by pollutants created by diesel combustion. Using diesel in automobile engines produces Nitrous Oxide ("NOX") in larger amounts than gasoline or other fuels. NOX is a toxic pollutant that produces smog and a litany of environmental and health problems.

56. Though more efficient, diesel engines create higher levels of NOX and soot, or particulate matter ("PM"), than emissions from gasoline engines due to the different ways the fuels combust and the varying methods of treating the resulting emissions following combustion. One way NOX emissions can be reduced is to adjust the compression and temperature, but that in turn produces PM, a similarly undesirable hydrocarbon-based emission. Another way NOX emissions can be reduced is through treating the exhaust. Regardless of the approach, addressing emission controls issues was a thorny, expensive problem for all vehicle manufacturers that required intense collaboration with regulators and significant costs.

57. In 2006, Wolfgang Bernhard, then a top executive at VW AG (formerly of Daimler), championed a technology-sharing agreement with Mercedes-Benz and BMW to jointly develop an alternative emission control system utilizing urea—a post-combustion emission reductant generically referred to as "Diesel Exhaust Fluid" or "DEF." This was marketed as "BlueTEC" by Mercedes-Benz and "AdBlue" by Volkswagen and other German vehicle manufacturers. When injected into the exhaust stream in a catalyst chamber, those treatments convert NOX into nitrogen gas, water, and carbon dioxide. This alternative system was expensive, costing $350 per vehicle, and came with other compromises, including the need for installation of a DEF tank that would require regular refills.

CLASS ACTION COMPLAINT

58.     Unhappy with the expense, starting in 2006 Defendants reached a series of agreements concerning AdBlue.  The Circle of Five formed secret groups, which they called "Kungelrunden"; this can be loosely translated as groups in which "wheeling and dealing" take place.  As the consensus formed that a 19-liter tank with moderate AdBlue consumption was necessary to satisfy U.S. emissions standards, the Kungelrunden engaged in heated discussions about tank size, AdBlue volumes, and service intervals.

59.     On April 5, 2006, the Manufacturer Defendants met in Sindelfingen, Germany, and jointly decided to restrict the size of AdBlue tanks and agreed tanks would be produced by only two suppliers.  By this time, development of the defeat devices at the heart of "Dieselgate" was underway at Volkswagen, Porsche, and Audi.

60.     Indeed, Bosch was well aware of the illegal agreement to limit tank sizes in the United States and Europe.  VW, Audi, BMW, and Daimler attended a meeting on October 19, 2006 with Bosch. Following the meeting, a VW manager's notes state: "Everybody wants a limitation" of the AdBlue injection "because of the limited size of the urea tank.  No one wants to report the real motivation of this limitation to the authorities (CARB, EPA)."

61.     In October 2007, the Circle of Five met again, sharing confidential information about tank size and debating the costs and benefits of smaller tanks.  The group was still considering using tanks with volumes "between 17 and 35 liters" at that time, but the Five were concerned about the costs.[14]  Internal documents reflected a "need for coordination" among the Manufacturer Defendants and subsequent "secret" meetings and discussions followed.[15]

62.     By 2008, it was obvious that smaller urea tanks would not be sufficient to meet new U.S. emissions standards that took effect in 2014.  These new standards imposed costs and challenges at a time when each Manufacturer Defendant sought to expand into the diesel market in the U.S.  The Manufacturer Defendants agreed that to comply with U.S. regulations, "a minimum tank volume of 19

---

[14]     *Das Auto-Syndikat.*

[15]     *Id.*

15                        CLASS ACTION COMPLAINT

liters at moderate AdBlue consumption" was required; AdBlue tanks needed to hold enough urea that the tanks only needed refilling every 16,000 kilometers.[16]

63.    However, documents obtained by the undersigned counsel demonstrate that by early 2010, Manufacturer Defendants agreed to develop only an eight-liter tank for use in Europe and a 16-liter tank for the United States.  The Defendants were aware that these tanks might not comply with E.U. or U.S. standards.  Tanks of this size would only treat emissions for a fraction of the life of the automobile.  These documents confirm that all five Manufacturer Defendants colluded ***at the board level*** to evade emissions requirements by limiting the tank size.  A bullet point on the following slide reads, "Commitment by the German automobile manufacturers at the board level: in the future, use of small AdBlue tanks (8 + x l) in Europe."

---

[16]    *Id.*



**Clean Diesel strategy, SCR tank strategy & AdBlue infrastructure**

TSK. Ingolstadt. April 1, 2010

TSK = Technisches Strategiekommittee = Technical Strategy Committee

Translation by Sylvia Sunn, Bleichmar Fonti & Auld, LLP, July 27, 2017



Translation by Sylvia Sum, Bleichmar Fonti & Auld, LLP, July 27, 2017

## AdBlue Consumption
## Overview Europe and NAR



AdBlue consumption

AdBlue tank volume          Service interval

All data is in l / 1000 km

| | EU6 Compliance with regulation | EU6 With off-cycle | Until MY2014 LEV II (ULEV / Bin5) | From MY2014 LEV II (SULEV / Bin2) |
|---|---|---|---|---|
| Passenger car R4 TDI | | 1.0* | 1.0 / 0.8*** | 1.2 |
| Passenger V6 TDI | 0.5 | 1.0 – 1.2** | 0.8 | 1.0 – 1.2** |
| SUV R4 TDI | | 1.5 | 1.5 | 1.8 |
| SUV V6 TID | 0.6 | 1.3 – 1.5** | 1.0 | 1.3 – 1.5** |

\* R4 TDi: off-cycle in general available

\*\* AdBlue consumption depends on driving profile

\*\*\* applies to MQB-A (Modular Transverse Matrix-A) km

**AdBlue consumptions are rising substantially in Europe due to the internal off-cycle targets.**

**IN NAR, the AdBlue consumptions increase due to the tightening of emissions limits.**

18  VGIA, VEA, VEF, IV   03/24/2010

Vorsprung durch Technik   Audi

Translation by Sylvia Sum, Bleichmar Fonti & Auld, LLP, July 28, 2017

64.     Tragically, the agreements reached by the Manufacturer Defendants ensured that consumers—many of whom purchased the Manufacturer Defendants' diesel vehicles because of promises of superior emissions technology—would not only be deprived of the benefit of the Diesel Premium, but would also unwittingly contribute to air pollution in their communities.  It could not be clearer that this conspiracy targeted the United States and its strict emissions standards.

65.     Attendees at this presentation likely included Rupert Stadler, Audi CEO and Chair of the Audi Board of Management, Axel Eiser, Head of Audi Powertrain Development, and others.  Eiser was also intimately familiar with the development of a transmission-related defeat device in Audi gas vehicles, first reported on November 5, 2016.

66.     Critically, each of the Circle of Five held to its commitment, even as the vehicles struggled to meet U.S. emissions standards.  This is a testament to the power of the cartel; none of the Circle of Five resolved its individual emissions compliance dilemma by introducing a larger urea tank.  According to German media, the reason is that it would have tipped off U.S. regulators: why would one company need room for more urea when the others did not?  Because it would have risked revelation of the fraud, each of the Manufacturer Defendants declined to install larger tanks.

67.     In May 2014, Audi warned other Manufacturer Defendants that unilateral efforts to increase the size of AdBlue tanks would result in an "arms race with regards to tank sizes, which is to be avoided as far as possible."[17]  Of course, as Audi had addressed "compliance" with emissions controls in the U.S. via defeat devices, it was only logical that it would seek to enforce the collusive agreement restricting tank size.

68.     Bosch played an integral role in the development of defeat devices, necessitated by the cartel's agreement to limit tank urea size for all of the Circle of Five manufacturers.  Upon information and belief, Bosch revealed in a meeting with German's Ministry of Transport that Bosch would offer "optimization tools" to clients, which included defeat device "options" with its EDC17, the engine control unit used in diesel vehicles.  Bosch has publicly denied liability for calibrating the defeat devices, but it paid $327.5 million to settle claims against Bosch in Dieselgate.  Bosch is also under

---

[17]     *Das Auto-Syndikat.*

CLASS ACTION COMPLAINT

investigation for participating in the development of defeat devices for other car manufacturers, including Fiat. Bosch has profited handsomely from participating in a cottage industry based on deceiving U.S. regulators and consumers about the technology in German Automobiles, enabling both the German Premium and the Diesel Premium.

69.     Similarly, IAV also played a critical role in the development of defeat devices at Audi, Porsche, and VW.

## VI.     AGREEMENT TO LIMIT TECHNOLOGIES OTHER THAN EMISSIONS CONTROL SYSTEMS

70.     These agreements to forestall and limit technological innovation did not end with emissions controls systems in diesel vehicles. The Manufacturer Defendants conspired with respect to virtually all areas of technological development. According to the written statement by Volkswagen to antitrust regulators, "there was an exchange of internal competitively sensitive technical data" establishing "technical standards" and agreeing to install "only certain technical solutions" in new vehicles.[18] The Manufacturer Defendants exchanged commercially sensitive data, for example, about the "driving resistance coefficient."[19]

71.     The Manufacturer Defendants' agreement to restrict competition with respect to technological developments and innovation ensured that improvements in design and engineering occurred haltingly and in lock-step.

72.     Working group meetings through the VDA established rules regulating technical standards that specified that no one manufacturer could be far enough ahead of another in terms of innovations such that another would lose sales. According to *Der Spiegel*, "When a manufacturer introduced a breakthrough technology, the others had to be capable of offering this technology relatively quickly as well."[20] That is, rather than actually obtaining "advantage through technology," or "Vorsprung durch Technik," the Circle of Five created their own market dominance by not competing on technology.

---

[18]     *Id.*
[19]     *Id.*
[20]     *Id.*

CLASS ACTION COMPLAINT

73.     One working group set the maximum speed at which convertible roofs could be opened and closed (50 kilometers per hour).  The "clutch" working group discussed when the parking lock should be activated, and minutes following a meeting specifically sought clarification as to whether there was a "working group standstill agreement."[21]

74.     Other working groups focused on brake controls and seat systems.  The "foreign motor analysis" working group shared data so frequently its members joked about "give and take."[22]  One way in which this sharing undermined competitive advantage was that rather than requiring the Manufacturer Defendants to gather information by driving their competitors' vehicles, they simply shared sensitive data.  This particular working group was mindful of antitrust liability for their actions; one participant worried that one of the excluded manufacturers might complain to the German Cartel Office.

75.     On September 24, 2013, the "air suspension" working group met to exchange information about supplier performance, presumably with the goal of determining who would continue supplying the cartel.  In this particular meeting, Daimler and Porsche shared specific information about the performance of ZF Friedrichshafen, a company that had been supplying Defendants with parts for suspensions.

76.     These collusive activities were in stark contrast with general market perception of German auto manufacturers, which Defendants actively cultivated.  Ordinarily, innovation is strongly correlated with competition and the market rewards innovators by supporting their products priced at a premium.  Here, Defendants' secret agreements to let the Five appear as innovators permitted them to levy unlawful, unearned premiums for their automobiles sold in the United States—the Diesel Premium and the German Premium.

77.     The type of information shared by the Manufacturer Defendants would enable the Five to determine the prices at which German Automobiles were to be sold.  The Manufacturer Defendants shared competitively sensitive information concerning their costs, suppliers, as well as many aspects of automobile design and testing.  On information and belief, this exchange of information allowed the Manufacturer Defendants to maximize the premiums paid by members of the Classes.

---

[21] *Id.*
[22] *Id.*

CLASS ACTION COMPLAINT

## VII.   DEFENDANTS TARGETED MARKETING AND SALES TO U.S. CONSUMERS

78.     The revelation of this cartel shatters the long-held myth of German engineering, which each Manufacturer Defendant carefully curated in its marketing intentionally and carefully targeting U.S. consumers for decades.  To U.S. consumers, German automobiles as a brand command a premium price due to promises of superior innovation and engineering.

79.     For example, VW's long used tagline, "That's the power of German engineering," conveyed that customers would receive cutting edge technology, for which consumers paid a premium.[23] "Volkswagen has long touted 'German engineering' as the key difference between its cars and their competitors."[24]  In a 2014 Super Bowl advertisement from Volkswagen, German engineers sprouted wings each time a Volkswagen automobile reached 100,000 miles.[25]  Volkswagen's Vice President of Marketing, Vinay Shahani, noted of the ad, "We are thrilled with this year's creative, which highlights the enthusiasm around our brand and our vehicles' German engineering in a humorous spot that embodies the Volkswagen spirit."[26]

80.     Likewise, claims of superior design and technology have been at the heart of BMW's marketing in the United States for decades.  BMW advertises its automobiles in the United States as "the ultimate driving machine," powered by "performance, design, innovation and efficiency."[27]  The auto company boasts of its "pure BMW performance" and "innovative eDrive technology" and claims that

---

[23]     Alextube145, *That's the Power of German Engineering*, YOUTUBE (Sept. 5, 2012), https://www.youtube.com/watch?v=Aw8K233BdL0 (last visited July 27, 2017); "That's the Power of German Engineering" Volkswagen Advertisement, *available at* https://mir-s3-cdn-cf.behance.net/project_modules/max_1200/d34c6522226435.56045b677fcbf.jpg (last visited July 27, 2017).

[24]     Don Sherman, *What, Exactly, Does Volkswagen Mean by "German Engineering," Anyway?*, CAR AND DRIVER (Jan. 3, 2017, 8:15 AM), http://blog.caranddriver.com/what-exactly-does-volkswagen-mean-by-german-engineering-anyway/ (last visited July 27, 2017).

[25]     Blue Cobs, *VW Super Bowl Commercial Get Wings Super Bowl Ad 2014*, YOUTUBE (Feb. 2, 2014), https://www.youtube.com/watch?v=sylr-XHKcPg (last visited July 27, 2017).

[26]     David Gianatasio, *Ad of the Day: Volkswagen Gets Its Wings in 2014 Super Bowl Ad*, ADWEEK (Jan. 28, 2014), http://www.adweek.com/brand-marketing/ad-day-volkswagen-gets-its-wings-2014-super-bowl-commercial-155270/ (last visited July 27, 2014).

[27]     *Vehicles*, BMW: THE ULTIMATE DRIVING MACHINE, https://www.bmwusa.com/vehicles/bmwi.html (last visited July 27, 2017).

"[a]t the heart of every BMW is advanced engineering that ensures maximum power and performance."[28]  "Always innovative, BMW has pioneered technology that creates exhilarating and efficient driving experiences," BMW claims.[29]  BMW publicized its 45 years of Bavarian engineering excellence in part by producing a six-part video on the history of the 5-Series.[30]

---

[28]    *What Makes a BMW a BMW?*, BMW: THE ULTIMATE DRIVING MACHINE, [http://www.bmwusa.com/InsideBMW.aspx (last visited July 27, 2017).

[29]    *What Makes a BMW a BMW?*, BMW: THE ULTIMATE DRIVING MACHINE, http://www.bmwusa.com/InsideBMW.aspx (last visited July 27, 2017).

[30]    *Today's BMW 535i Reflects 45 Years of Bavarian Automotive Engineering Excellence*, SOUTH BAY BMW (Mar. 15, 2017), http://www.southbaybmw.com/blog/2017/march/15/todays-bmw-535i-reflects-45-years-of-bavarian-automotive-engineering-excellence.htm?locale=en_US (last visited July 27, 2017); BMW, *The BMW 5 Series History*, YOUTUBE (Dec. 28, 2016), https://www.youtube.com/watch?v=UFJwxJpoemU#action=share (last visited July 27, 2017).



"With 333 horses, the power is Herculean.  The handling, telepathic.  And the brakes, breathtaking.  Add a roof that disappears as swiftly as its taillights, and you have pure, unremitting love."

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

81.     BMW has promoted its cars, including the cars of its subsidiary, MINI USA, in American entertainment.  As one example, the MINI Cooper S starred in the adrenaline-pumping driving sequences of the video game *The Bourne Conspiracy*, released by video game company Vivendi Games in the United States in June 2008.  Kate Alini, MINI Marketing Communications Manager, announced at the time, "The role of the MINI Cooper S in *The Bourne Conspiracy* game is a great fit for the MINI brand.  As the featured vehicle and Bourne's getaway car, this integration allows us to demonstrate the agility and performance that's inherent in the full line of MINI vehicles."[31]

82.     Another example of BMW product placement in the United States with a heavy focus on technology is *The Italian Job*, an American movie released in 2003 that features an extensive, exciting car chase scene in which drivers of MINI Coopers (a BMW subsidiary) are chased by motorcycles through tunnels.  The drivers navigate the MINI Coopers onto the side of the tunnels, execute difficult stunt maneuvers, and showcase the highly recognizable MINI Coopers as high-performance vehicles that daring gold thieves would use to escape a homicidal criminal.

---

[31]     Joel Arellano, *Mini Cooper S Is a Getaway in the Bourne Conspiracy Game*, AUTOMOTIVE.COM (June 26, 2008), www.automotive.com/news/mini-cooper-s-is-a-getaway-in-the-bourne-conspiracy-game-5281/ (last visited July 27, 2017).



"Even with the brakes on... The new Mini John Cooper Works."

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

83.     Mercedes-Benz similarly publicizes its engineering innovation, targeting U.S. consumers. In 2011, Mercedes-Benz launched a brand campaign celebrating "125 Years of Innovation."[32]  The Mercedes-Benz USA website touts Daimler's history as an innovator to U.S. consumers: "Leading through innovation.  Even more than its meticulous engineering, Mercedes-Benz is defined by its continuous innovation.  Since inventing the car in 1886, we've simply never stopped reinventing it."[33]

---

[32]     Inchcape Mercedes-Benz, *Mercedes-Benz Celebrates 125 Years of Innovation*, YOUTUBE (Apr. 5, 2011), https://www.youtube.com/watch?v=PTxclPfn-uc (last visited July 27, 2017).

[33]     *Leading Through Innovation*, MERCEDES-BENZ, https://www.mbusa.com/mercedes/benz/innovation (last visited July 27, 2017).



"Environmental hero incognito. With 7G-TRONIC, the powerful seven-speed automatic transmission, the GLK reduces fuel consumption and increases riding comfort at the same time. Additionally, its efficient technologies set the standard for today's automotive engineering. BlueEFFICIENCY is our way to emission free mobility…"

84.     In glaring contrast to its repressive activities, Audi's company motto is "Vorsprung durch Technik," or "advantage [over other companies] through technology."  Audi has also used the tagline "Truth in Engineering" in its print and television advertising.[34]

### VIII.     EACH DEFENDANT MET WITH U.S. REGULATORS TO OBTAIN PERMISSION TO SELL VEHICLES IN THE UNITED STATES

85.     The State of California has passed and enforced laws designed to protect its citizens from pollution.  Automobile manufacturers selling vehicles in California and in states adopting California standards must abide by these laws, which are enforced by CARB.  Defendants also specifically wooed U.S. regulators to obtain approval of vehicles built specifically for sale to U.S. consumers.

86.     CARB was targeted by Defendants' conspiracy with respect to the "clean diesel" agreements.  California emissions standards are more stringent than those imposed by European and U.S. regulators.  Additionally, a substantial number of German Automobiles are sold to Californians.  Thus, it was crucial that Defendants succeeded in deceiving CARB with respect to emissions of diesel vehicles.

87.     To encourage EPA and CARB regulators to permit the sale of diesel automobiles in the United States, all Defendants engaged in marketing campaigns that included shipping vehicles from Germany to the United States so that regulators could drive them.  For example, German manufacturers, including Daimler and VW, participated in a "Clean Diesel Media Ride-and-Drive" hosted by Bosch on January 31, 2006, followed by a February 2, 2006 "Clean Diesel Symposium" in Sacramento, California.  The Clean Diesel events targeted journalists, environmentalists, policymakers, and regulators to promote "the benefits of modern clean diesel technology and understand the role of clean diesel vehicles for California's consumers."[35]

88.     On October 17, 2007 Audi and the VDA hosted a Symposium in San Francisco "to promote how activities of the German automotive industry advance the development of technologies,

---

[34]     Audi USA, *"It Couldn't Be Done" – New Audi Commercial*, YOUTUBE (Mar 13, 2013), https://www.youtube.com/watch?v=xZjykPITuq0 (last visited July 27, 2017).

[35]     *Bosch Drives Clean Diesel in California*, BOSCH, http://www.bosch.us/content/language1/html/734_4066.htm?section=28799C0E86C147799E02226E942307F2 (last visited July 27, 2017).

reducing $CO_2$ emissions."  Presentations focused on German developments in $CO_2$ reduction technologies including powertrain solutions, transmission technologies, direct injection systems, and start/stop systems.[36]

89.    On October 3, 2008, the German Embassy in Washington D.C. hosted its second annual "Future Motion Made in Germany" symposium to highlight German automotive technologies including "clean diesel" technology.  Sponsors of the event included BMW, Daimler, Audi, Porsche, and Volkswagen of America.[37]

90.    In April 2009, Bosch hosted a "Diesel Day" event in Sacramento, California, attended by representatives from Audi, BMW, and Volkswagen.[38]  Bosch invited CARB to the event as well, to showcase the Manufacturer Defendants' "clean diesel" vehicles.

91.    In December 2012, German automakers launched a "joint promotion campaign" to promote clean diesel vehicles in the U.S.  Under the auspices of the VDA and its member companies, Audi, BMW, Bosch, Daimler, Porsche, and Volkswagen, the campaign adopted the slogan "Clean Diesel.  Clearly Better."[39]

92.    The German American Chamber of Commerce hosted an Automotive Forum with Audi, BMW, Daimler, Porsche, and Volkswagen on March 28, 2013 in New York City titled "Clean Diesel on

---

[36]    Press Release, Bosch, Bosch Reinforces Carbon Dioxide Reduction Technologies in California (Oct. 18, 2007), *available at* http://us.bosch-press.com/tbwebdb/bosch-usa/modules/boschinfokorb.dll/presstext.pdf?db=tbwebdb_us&langid=1&txtids=321&dpi=72&download=presstext.pdf (last visited July 27, 2017).

[37]    Press Release, Bosch, Bosch: Clean Diesel Is Key Part of Future Technology Mix (Oct. 6, 2008), *available at* http://us.bosch-press.com/tbwebdb/bosch-usa/modules/boschinfokorb.dll/presstext.pdf?db=tbwebdb_us&langid=1&txtids=364&dpi=72&download=presstext.pdf (last visited July 27, 2017).

[38]    *Propel Fuels Showcases Next Generation Green Diesel at California Diesel Days*, BUSINESSWIRE (Apr. 1, 2009, 12:23 PM), http://www.businesswire.com/news/home/20090401006406/en/Propel-Fuels-Showcases-Generation-Green-Diesel-California (last visited July 27, 2017).

[39]    *"Clean Diesel.  Clearly Better."  Campaign for Clean Diesel Cars Welcomed*, CISION PR NEWSWIRE (Dec. 12, 2012 4:10 PM), http://www.prnewswire.com/news-releases/clean-diesel-clearly-better-campaign-for-clean-diesel-cars-welcomed-183261432.html (last visited July 27, 2017).

CLASS ACTION COMPLAINT

the Rise."  All the participating firms contributed "automotive experts" to a panel discussion and the forum included a presentation by the VDA.[40]

93.     Defendants' U.S. subsidiaries played an important role in implementing the scheme. Defendants' U.S. subsidiaries sold and marketed the German Automobiles that are at issue and negotiated with U.S. and California regulators regarding compliance with emissions requirements and other U.S. law.  Each of the Defendants has a subsidiary with a presence in this District, as individuals the San Francisco Bay Area purchase tens of thousands of German Automobiles a year.

94.     Defendants' U.S. subsidiaries acted as agents to their German parents in connection with the sale and marketing of German Automobiles.

## IX.    THE MARKET FOR GERMAN AUTOMOBILES

95.     German Automobiles are a differentiated product market.  By reputation, German Automobiles are said to be among the best-engineered vehicles in the world.  In the United States, members of the Classes paid a premium for German Automobiles across classes of automobiles.

96.     German Automobiles are distinct from those manufactured by competitors and the Manufacturer Defendants have spent many millions of dollars advertising the virtues of German engineering.

97.     The Manufacturer Defendants know and understand that their closest competition among U.S. consumers are other members of the Circle of Five.  This is demonstrated by the Manufacturer Defendants' practice of opening up dealerships in locations where their fellow cartel members have been operating.  Consumer preference for German Automobiles indicates cohesiveness; second-choice surveys of German Automobile purchases consistently show that consumers who purchased German Automobiles would have purchased from another member of the Circle of Five.

98.     The Manufacturer Defendants limited manufacturer membership in the conspiracy to the Circle of Five.  During the Class Period, Defendants rejected requests from Jaguar, Volvo, Renault, and Fiat to join their exchange of information.

---

[40]     *BACC Automotive Forum with Audi, BMW, Daimler, Porsche & VW*, GERMAN AMERICAN CHAMBERS OF COMMERCE, http://www.gaccny.com/en/events/our-events/gacc-event/events/gacc-automotive-forum-with-audi-bmw-daimler-porsche-vw/ (last visited July 27, 2017).

CLASS ACTION COMPLAINT

99.     Due to their unique place in the U.S. market, brand equity, and marketing campaigns, the Circle of Five enjoy price inelasticity for German Automobiles.  Price inelasticity means that because demand for German Automobiles is strong, consumers will continue to purchase German Automobiles even if prices increase or are high relative to other automobiles.

100.    The promise of innovative German engineering also makes German Automobiles price inelastic.  This feature allows the Manufacturer Defendants to demand a premium from members of the Classes in the prices for German Automobiles.  That Manufacturer Defendants have shared cost information with one another ensures that German Automobiles are consistently priced at a premium.

101.    Due to the conspiracy alleged herein, the normal pace of innovation was replaced by cartel-dictated staging.  Plaintiffs and members of the Classes paid a premium for German Automobiles because the Manufacturer Defendants had a reputation for engineering excellence and cutting edge technology.  The premiums paid are supracompetitive, however, because the Manufacturer Defendants used their market power to suppress competition for the very technological advances consumers sought.

102.    There are high barriers to entry in the market for German Automobiles.  Firms entering this market need to invest tens of millions of dollars in research and development, including engineering talent.  Competitor firms would need to invest tens of millions of dollars more to build facilities and obtain the raw materials in order to produce automobiles.  Notably, no non-German manufacturer was invited into the Circle of Five, and no other significant German automobile manufacturer competed in any material way in U.S. sales during the Class Period.

## X.     DEFENDANTS' HISTORY OF COLLUSION AND WRONGDOING

103.    The Circle of Five has a history of collusion.  In 2016, the EC fined Daimler and other European car makers $3.2 billion for participating in a scheme to fix prices for trucks.  MAN, a subsidiary of Volkswagen, participated in the scheme but did not pay a fine because it was the first to disclose the existence of the scheme to regulators.[41]

---

[41]     James Kanter, *Price-Fixing Truck Makers Get Record E.U. Fine: $3.2 Billion*, N.Y. TIMES, July 19, 2016, at B2, *available at* https://www.nytimes.com/2016/07/20/business/international/eu-trucks-europe-volkswagen.html?mcubz=0 (last visited July 27, 2017).

104.    In June 2016, Germany's Federal Cartel Office investigated Bosch, BMW, Volkswagen, and Daimler concerning allegations that there had been collusion in steel purchases related to automobiles.[42]

105.    As part of Dieselgate, Volkswagen has paid an unprecedented $20 billion to U.S. regulators and private parties in penalties, civil restitution, and settlement payments in connection its scheme to use a "defeat device" to cheat emissions tests.[43]

106.    Indictments arising from Dieselgate may also have yielded information relating to this cartel.  On June 1, 2016, a manager at Volkswagen of America's Test Center California, James Liang, was indicted for conspiracy to defraud the United States, conspiracy to commit wire fraud, conspiracy to violate the Clean Air Act, and violation of the Clean Air Act.  James Liang had been an engineer in Volkswagen AG's diesel development department from 1983 until May 2008, when he moved to the United States to assist in the launch of VW's new TDI line of diesel vehicles.  As Leader of Diesel Competence in VW's Test Center California, Liang assisted in certification, testing and warranty issues for VW diesel vehicles in the United States.[44]  Liang pled guilty to his role in the nearly ten-year conspiracy to defraud U.S. regulators and U.S. Volkswagen consumers on September 9, 2016.  Under Liang's plea agreement, he agreed to "cooperate with the government in its ongoing investigation."[45]

---

[42]    Stefan Ogbac, *Various German Automakers, Suppliers Raided Over Steel-Purchasing Cartel Probe*, AUTOMOBILE (July 6, 2016), http://www.automobilemag.com/news/various-german-automakers-suppliers-raided-steel-purchasing-cartel-probe/ (last visited July 27, 2017).

[43]    Press Release, Department of Justice Office of Public Affairs, Volkswagen AG Agrees to Plead Guilty and Pay $4.3 Billion in Criminal and Civil Penalties (Jan. 11, 2017), *available at* https://www.justice.gov/opa/pr/volkswagen-ag-agrees-plead-guilty-and-pay-43-billion-criminal-and-civil-penalties-six (last visited July 27, 2017); *U.S. Judge Approves $14.7 Billion Settlement in VW Diesel Scandal*, FORTUNE (Oct. 25, 2016), http://fortune.com/2016/10/26/settlement-vw-diesel-scandal/ (last visited July 27, 2017).

[44]    *United States v. Liang*, No. 2:16-cr-20394-SFC-APP, Indictment (E.D. Mich. June 1, 2016), *available at* https://www.justice.gov/opa/file/890761/download (last visited July 27, 2017).

[45]    *Id.*

34                                              CLASS ACTION COMPLAINT

107.    On January 7, 2017, Oliver Schmidt, formerly General Manager of Engineering and Environmental Affairs office for Volkswagen of America, was arrested in Miami, Florida.[46]  Schmidt was criminally charged with participation in a conspiracy to defraud the United States through a campaign of deception aimed at U.S. regulators regarding the existence of a defeat device in VW clean diesel vehicles.[47]

108.    Further, Schmidt was named as one of six VW executives and employees in an indictment returned by a federal grand jury in the Eastern District of Michigan, charging Schmidt with eleven felony counts including conspiracy to defraud the United States, conspiracy to defraud VW's U.S. consumers, conspiracy to violate the Clean Air Act, wire fraud and violations of the Clean Air Act.[48]  On July 25, 2017, lawyers for Schmidt informed a judge for the Eastern District of Michigan that Schmidt had decided to enter a guilty plea at a hearing schedule for August 4, 2017.  It is unclear if Schmidt will agree to cooperate with prosecutors as a condition of his plea agreement.[49]

109.    Similarly, Giovanni Pamio, a manager in Audi's U.S. V6 Diesel Development Certification and OBD group (Thermodynamics), was indicted on July 6, 2017 and is rumored to be cooperating with U.S. authorities.[50]

---

[46]    Megan Geuss, *VW Exec Arrested During Miami Vacation Over Emissions Scandal*, ARS TECHNICA (Jan. 10, 2017, 6:38 AM), https://arstechnica.com/cars/2017/01/vw-exec-arrested-during-miami-vacation-over-emissions-scandal/ (last visited July 27, 2017).

[47]    Adam Goldman, Hiroko Tabuchi, and Jack Ewing, *F.B.I. Arrests Volkswagen Executive on Conspiracy Charge in Emissions Scandal*, N.Y. TIMES, Jan. 9, 2017, at A13, *available at* https://www.nytimes.com/2017/01/09/business/volkswagen-diesel-emissions-investigation-settlement.html (last visited July 27, 2017).

[48]    Press Release, Department of Justice Office of Public Affairs, Volkswagen AG Agrees to Plead Guilty and Pay $4.3 Billion in Criminal and Civil Penalties; Six Volkswagen Executives and Employees are Indicted in Connection with Conspiracy to Cheat U.S. Emissions Tests (Jan. 11, 2017), *available at* https://www.justice.gov/opa/pr/volkswagen-ag-agrees-plead-guilty-and-pay-43-billion-criminal-and-civil-penalties-six (last visited July 27, 2017).

[49]    Neal E. Boudette, *Volkswagen Executive to Plead Guilty in Diesel Emissions Case*, N.Y. TIMES, July 26, 2017, at B6, *available at* https://www.nytimes.com/2017/07/25/business/volkswagen-diesel-scandal-oliver-schmidt-guilty.html (last visited July 27, 2017).

[50]    Press Release, Department of Justice Office of Public Affairs, Former Audi Manager Charged in Connection With Conspiracy to Cheat U.S. Emissions Tests (July 6, 2017), *available at* https://www.justice.gov/opa/pr/former-audi-manager-charged-connection-conspiracy-cheat-us-emissions-tests (last visited July 27, 2017).

110. In addition, raids by authorities in the European Union potentially relate to the unfolding revelation of this cartel. The week of January 23, 2017, German prosecutors in Braunschweig and Munich raided 28 offices and residences in Germany in connection with their investigations into the diesel emissions scandal. Included in the raids was the office and villa of former Volkswagen AG Chairman Martin Winterkorn.[51] Bosch's offices were also rumored to have been raided; IAV's definitely were.

111. On March 15, 2017, the same day as Audi's annual press conference, Munich prosecutors launched raids aimed at Audi offices, including searches conducted at Audi headquarters in Ingolstadt, an Audi factory in Neckarsulm, seven private residences, and offices in the states of Baden-Württemberg and Lower Saxony.[52]

112. Included in the raids were the German offices of Jones Day, the American law firm which had been hired in late 2015 by the VW AG Board to lead an internal inquiry into the emissions cheating and submit a report.[53] The Jones Day report was never produced in civil litigation in Dieselgate and the collusion alleged herein remained undisclosed until recently.

113. Reports indicate that prosecutors also targeted 47 Volkswagen Group employees, including VW AG Chief Executive Matthias Mueller and Audi CEO Rupert Stadler, as well as departments including sales, marketing, personnel, engine development and legal compliance along with

---

[51]   *Ermittlungen gegen Winterkorn wegen Betrugsverdachts*, SPIEGEL ONLINE (JAN. 27, 2017, 5:53 PM), http://www.spiegel.de/wirtschaft/unternehmen/martin-winterkorn-staatsanwaltschaft-ermittelt-wegen-betrugsverdacht-a-1132013.html (last visited July 27, 2017).

[52]   Hans Leyendecker, Georg Mascolo, Klaus Ott and Nicolas Richter, *German Police Raids Audi Headquarters Over Emissions Fraud,* SZ INTERNATIONAL (Mar. 15, 2017), http://international.sueddeutsche.de/post/158428520320/germanpoliceraidsaudiheadquartersover (last visited July 27, 2017).

[53]   Jack Ewing and Bill Vlasic, *German Authorities Raid U.S. Law Firm Leading Volkswagen's Emissions Inquiry*, N.Y. TIMES, Mar. 17, 2017, at B1, *available at* https://www.nytimes.com/2017/03/16/business/volkswagen-diesel-emissions-investigation-germany.html (last visited July 27, 2017).

executive offices.  Prosecutors seized documents, emails, personal calendars, notebooks, mobile phones and electronic passwords from current and past Volkswagen and Audi employees.[54]

114.    Authorities conducted additional searches of eleven Daimler locations in Germany, including Daimler's headquarters in Stuttgart, on May 23, 2017 in connection with the Stuttgart prosecutor's investigation of fraud and false advertising in relation to the manipulation of exhaust gas treatment in diesel passenger cars.[55]

115.    While *Der Spiegel* reported that Volkswagen made a voluntary declaration to the German and E.U. competitions offices on July 4, 2016, German and U.S. media have reported that Daimler declared itself to the authorities "significantly earlier" and may have begun cooperating with competition authorities as early as 2014.[56]  Daimler may avoid a multimillion-dollar fine by cooperating first.  Volkswagen may also receive a discount.

116.    Further, on June 23, 2016, ten days before Volkswagen's voluntary declaration, dawn raids were conducted by the German Federal Cartel Office (Bundeskartellamt) at the offices of BMW, Daimler, Volkswagen, Bosch, and ZF Friedrichshafen as part of an investigation into suspected breaches of German's competition law.  Reports indicate that the investigation stemmed from suspicions raised in an earlier probe into alleged anti-competitive behavior by three steel manufacturers.[57]  It has not yet been revealed if the steel investigation is connected.

---

54      Jack Ewing, *Offices of Volkswagen and Audi Chiefs Searched in Raid, Warrant Says*, N.Y. TIMES, Mar. 19, 2017, at B2, *available at* https://www.nytimes.com/2017/03/19/business/volkswagen-chief-executive-emissions-warrant.html (last visited July 27, 2017).

55      Gilbert Kreijger and Markus Fasse, *Raids at Mercedes Sites*, HANDELSBLATT GLOBAL (May 23, 2017, 2:57 PM), https://global.handelsblatt.com/companies-markets/raids-at-mercedes-sites-770689 (last visited July 27, 2017).

56      Bertel Schmitt, *German Car Cartel Triggers Rat-Out-Race Between Daimler, Volkswagen and BMW*, FORBES (July 25, 2017, 11:59 AM), https://www.forbes.com/sites/bertelschmitt/2017/07/25/german-car-cartel-triggers-rat-out-race-between-daimler-volkswagen-and-bmw/#31ed7a1c5c1a (last visited July 27, 2017); *see also BMW Halts Project Talks After Daimler Blew Whistle – Sueddeutsche*, REUTERS (July 25, 2017, 12:01 PM), http://uk.reuters.com/article/uk-germany-emissions-daimler-bmw-idUKKBN1AA2GK (last visited July 27, 2017).

57      Steve Garnsey, *German Authorities Raid Carmakers and Tier Suppliers*, AUTOMOTIVE LOGISTICS (July 8, 2016), https://automotivelogistics.media/news/german-authorities-raid-carmakers-tier-suppliers (last visited July 27, 2017).

## XI.   TOLLING OF THE STATUTE OF LIMITATIONS

117.   Plaintiffs and members of the Classes had no knowledge of the secret meetings Defendants attended to exchange competitively sensitive information.  Indeed, Defendants fraudulently concealed the existence of their agreements.

118.   The Circle of Five called their secret meetings "Kungelrunden," which is a German term that roughly translates to English as "wheeling and dealing."  In internal communications, the Five acknowledged that the meetings and events were "secret" and fretted that one of their fellow members of the Circle of Five would disclose their activities to German and European regulators.  As of now, both Daimler and Volkswagen have disclosed Defendants' wrongdoing to regulators.  These belated disclosures to regulators show that Defendants knew all along that sharing competitively sensitive information was improper.

119.   Defendants, including the Bosch Defendants, took further steps to keep their collusion secretive.  Had any of the Circle of Five installed a larger than agreed upon AdBlue tank, the jig would have been up.  Certification and regulatory authorities would have questioned why the vehicles of one of the Five needed so much more urea for the treatment of exhaust gases, when the cars of all the others could supposedly use less urea.  Instead, all Defendants cooperated by hiding the cartel from regulators.

120.   The exclusive and secretive nature of Defendants' meetings is further underscored by the fact that Defendants excluded other automotive manufacturers from their meetings.

121.   The allegations of the Circle of Five cartel described herein were not publicly disclosed until *Der Spiegel* published an article detailing the conspiracy of the Circle of Five on July 21, 2017.[58]

122.   To conceal the conspiracy, Defendants made false representations to investors and the public that the Manufacturer Defendants competed fiercely.  Daimler's top executive, Dieter Zetsche, falsely boasted that Defendants vigorously compete, stating "almost every day, we are treading on each others' toes as neighbors.  In that respect, competition is something incredibly good."[59]  Harald Krüger, CEO of BMW, said, "Time and time again, this competition spurs us on to reach top

---

[58]   *Das Auto-Syndikat.*

[59]   *Id.*

performances."  Volkswagen CEO Matthias Müller praised the rivalry of the brands.  And Audi CEO Rupert Stadler said that competition had "brought us all a technological advantage."[60]

123.    To further the rise of intense competition, representatives of the Manufacturer Defendants loudly criticized their so-called competitors.  One Mercedes-Benz manager said critically of a Volkswagen, "You are better off buying a Škoda; it is 3,000 Euros cheaper and better."[61]  A BMW developer stated publicly that a new Audi "already looks as old as its predecessor."[62]  During at least one trade show, a Volkswagen board member said that a Daimler model "has gap dimensions like a truck."

124.    These representations were, at best, misleading, and were intended to bolster the false impression that the Manufacturer Defendants competed against one another on technological and design innovations.  It was both part of the continued concealment and a continued rationale for leveraging the German Premium and the Diesel Premium for German Automobiles.

## XII.   CLASS ALLEGATIONS

125.    All consumers who purchased or leased German Automobiles in the U.S. paid a German Premium for engineering and innovative technology.  U.S. consumers who purchased or leased for diesel cars paid an additional Diesel Premium.  Based on expert analysis, identifying variations in the German Premium and Diesel Premium as between each Manufacturer Defendant is ascertainable and identifiable.  Similarly, distinctions between purchasers of new and used automobiles are ascertainable and identifiable.

126.    Plaintiffs bring this action on behalf of themselves and as a class action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure for the following class ("**Diesel Premium Class**"):

All persons and entities who, during the Class Period, purchased or leased a German Automobile with a diesel engine in the United States, not for resale, which was manufactured or sold by a

---

[60]    *Id.*

[61]    *Id.*

[62]    *Id.*

CLASS ACTION COMPLAINT

Defendant, any current or former subsidiary of a Defendant or any co-conspirator of the Defendants.

127.    Plaintiffs bring this action on behalf of themselves and as a class action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure for the following class ("**German Premium Class**"):

All persons and entities who, during the Class Period, purchased or leased a German Automobile with a gas engine in the United States, not for resale, which was manufactured or sold by a Defendant, any current or former subsidiary of a Defendant or any co-conspirator of the Defendants.

128.    The Diesel Premium and German Premium Classes are referred to as the "Classes" throughout this Complaint.

129.    Excluded from the Classes are the Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and persons who purchased the vehicles at issue directly or for resale.

130.    There are common questions of law and fact as to all members of the Classes, including but not limited to the following:

a.    Whether the Defendants and their co-conspirators engaged in a scheme to artificially inflate the price of German Automobiles sold in the United States;

b.    The identity of the participants of the alleged conspiracy and their roles in implementing the scheme;

a.    The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

b.    Whether the alleged conspiracy violated Section 1 of the Sherman Act and state antitrust laws;

c.    Whether the alleged conspiracy violated state California unfair competition law;

CLASS ACTION COMPLAINT

d. Whether the conduct of the Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Classes;

e. Whether Plaintiffs paid premiums for German Automobiles sold in the United States during the Class Period as compared to other automobiles of similar size and class for diesel and German technology;

f. Whether the Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from Plaintiffs and the members of the Classes;

g. The appropriate injunctive and related equitable relief; and

h. The appropriate class-wide measure of damages for the Classes.

131. Typicality: Plaintiffs' claims are typical of the claims of the members of the Classes, and Plaintiffs will fairly and adequately protect the interests of the Classes. Defendants' conduct impacted Plaintiffs and the Classes in a common way—Plaintiffs and the Classes paid premiums for German Automobiles.

132. Commonality: The agreements and scheme alleged herein create many common questions of fact and law because Defendants' conduct had widespread yet predictable impact on Plaintiffs and the Classes.

133. Adequacy: Plaintiffs will fairly and adequately represent and protect the interests of the Classes. Plaintiffs' interests do not conflict with the interests of the Classes. Plaintiffs have retained counsel competent and experienced in complex class action litigation, including vehicle defect litigation and antitrust litigation. Plaintiffs intend to prosecute this action vigorously. Neither Plaintiffs nor their counsel have interests that conflict with the interests of the members of the Classes. Therefore, the interests of the Classes will be fairly and adequately protected.

134. Superiority: A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by each of the Plaintiffs and the members of the Classes are relatively small compared to the burden and expense that would be required to litigate these issues on an individual basis.

## XIII.    COUNTS

### (A)    COUNT I – VIOLATION OF SECTION I OF THE SHERMAN ACT, 15 U.S.C. § 1

135.    Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

136.    Defendants and their co-conspirators engaged in a continuing contract, combination, and conspiracy to artificially inflate, raise, maintain, and/or stabilize the prices of German Automobiles within the United States, its territories, and the District of Columbia  in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

137.    Defendants and their co-conspirators agreed to, and did in fact, restrain trade or commerce by inflating, raising, maintaining, and/or stabilizing the prices of German Automobiles.

138.    In formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to artificially inflate, raise, maintain, and/or stabilize the prices of German Automobiles.

139.    Among other things, Defendants conspired and agreed to reduce or eliminate competition for technological innovation and improvements with respect to clean diesel technology, suspension, electronic systems, transmissions, and automobile propulsion, among others.  As a result of this conspiracy, the prices paid by Plaintiffs and the Classes for German Automobiles were inflated.

140.    Competition in the market for German Automobiles has been reduced or eliminated.

141.    As a direct and proximate result of Defendants' conduct, Plaintiffs and members of the Classes have been injured and damaged in their business and property in an amount to be determined according to proof.

142.    As a result of the foregoing, Plaintiffs and all Classes are entitled to injunctive relief under Section 16 of the Clayton Act.

CLASS ACTION COMPLAINT

**(B)    COUNT II – VIOLATIONS OF THE CARTWRIGHT ACT,**

**CAL. BUS. & PROF. CODE § 16720,**

**AND VIOLATIONS OF OREGON REVISED STATUTES § 646.705 ET SEQ.**

143.    Defendants have entered into an unlawful agreement in restraint of trade in violation of California Business and Professions Code, §§ 16700 et seq. and Oregon Revised Statutes §§ 646.705 et seq.

144.    Defendants and their co-conspirators entered into a series of agreements in restraint of trade under California and Oregon law.  Defendants and their co-conspirators agreed to, and did in fact, restrain trade or commerce by inflating, raising, maintaining, and/or stabilizing the prices of German Automobiles.

145.    In formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to artificially inflate, raise, maintain, and/or stabilize the prices of German Automobiles.

146.    Among other things, Defendants conspired and agreed to reduce or eliminate competition for technological innovation and improvements with respect to clean diesel technology, suspension, electronic systems, transmissions, and automobile propulsion, among others.  As a result of this conspiracy, the premiums paid by Plaintiffs and the Classes for German Automobiles were inflated, and the value of the German Automobiles purchased by Plaintiffs was reduced.

147.    With respect to the Diesel Premium Class, the illegal combination and conspiracy alleged herein had the following effects, among others:

a.    The prices charged by Defendants to, and paid by, Plaintiffs and members of the Diesel Premium Class for German Automobiles were inflated, raised, maintained and/or stabilized at artificially high and non-competitive levels;

b.    Plaintiffs and members of the Diesel Premium Class have been deprived of free and open competition in the market for German Automobiles;

c.    Competition in the market for German Automobiles has been reduced or eliminated; and

d.    Competition in the market for suppliers for German Automobiles was diminished.

148.    With respect to the German Premium Class, the illegal combination and conspiracy alleged herein had the following effects, among others:

a.    The prices charged by the Manufacturer Defendants to, and paid by, Plaintiffs and members of the German Premium Class for German Automobiles were inflated, raised, maintained and/or stabilized at artificially high and non-competitive levels;

b.    Plaintiffs and members of the German Premium Class have been deprived of free and open competition in the market for German Automobiles;

c.    Competition in the market for German Automobiles has been reduced or eliminated; and

d.    Competition in the market for suppliers for German Automobiles was diminished.

149.    As a direct and proximate result of Defendants' conduct, Plaintiffs and members of the Classes have been injured and damaged in their business and property in an amount to be determined according to proof.

150.    Plaintiffs have suffered antitrust injury because they paid more for German Automobiles than they would have had the nature of Defendants' collusion been public at the time of purchase. Defendants charged supracompetitive prices based on the lure of cutting edge technology.  Plaintiffs paid these supracompetitive prices and had fewer choices for technological innovations in the market for German Automobiles.  The Manufacturer Defendants leveraged their market power to charge inflated prices for German Automobiles.

**(C)    COUNT III – VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW, CAL. BUS. & PROF. CODE § 17200 ET SEQ.**

151.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

152.    Plaintiffs bring this Count on behalf of themselves and the Classes against all Defendants.

153.    California Business and Professions Code § 17200 prohibits any "unlawful, unfair, or fraudulent business act or practices."  Defendants have engaged in unlawful, fraudulent, and unfair business acts and practices in violation of the UCL.

154.    Defendants' conduct, as described herein, was and is in violation of the UCL. Defendants' conduct violates the UCL in at least the following ways:

a.  by conspiring to limit or reduce technological advancements while obtaining money from Plaintiffs and members of the Classes for sales of German Automobiles;

b.  by conspiring to develop technology to install illegal "defeat device" in the German Automobiles to fraudulently cause German Automobiles to pass emissions tests when in truth and fact they did not pass such tests;

c.  by marketing German Automobiles as possessing state of the art or cutting edge engineering; and

d.  by violating other California laws, including laws governing truthful representations regarding characteristics and performance of the German Automobiles.

155.  Plaintiffs seek to enjoin further unlawful, unfair, and/or fraudulent acts or practices by Defendants under Cal. Bus. & Prof. Code § 17200.

156.  Plaintiffs request that this Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing its unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs and members of the Classes any money it acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in Cal. Bus. & Prof. Code § 17203 and Cal. Bus. & Prof. Code § 3345; and for such other relief set forth below.

## XIV.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray:

a.  That the Court determine that this action may be maintained as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to members of the Classes;

b.  That the Court adjudge and decree that the contract, combination and conspiracy alleged herein is a per se unreasonable restraint of trade in violation of Section 1 of the Sherman Act and state antitrust law;

c.  That the Court enter judgment against Defendants, jointly and severally, in favor of Plaintiffs and the Classes;

d.  That the Court award Plaintiffs and the Classes treble damages;

e.   That the Court award Plaintiffs and the Classes attorneys' fees and costs as well as pre-judgment and post-judgment interest as permitted by law; and

f.   That the Court award Plaintiffs and the Classes such other and further relief as may be deemed necessary and appropriate.

### XV.   JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(c), Plaintiffs demand a trial by jury on all matters so triable.

DATED this 28th day of July, 2017

BLEICHMAR FONTI & AULD LLP

By */s/ Lesley E. Weaver*_____
Lesley E. Weaver

Lesley E. Weaver (SBN 191305)
Matthew S. Weiler (SBN 236052)
Emily C. Aldridge (SBN 299236)
BLEICHMAR FONTI & AULD LLP
1999 Harrison Street, Suite 670
Tel:  (415) 445-4003
E-mail:  lweaver@bfalaw.com
E-mail:  mweiler@bfalaw.com
E-mail:  ealdridge@bfalaw.com

CLASS ACTION COMPLAINT