1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE: GERMAN AUTOMOTIVE
MANUFACTURERS ANTITRUST
LITIGATION
_____/

This Order Relates To:
Dkt. Nos. 391, 392, 409, 410, 411
_____/

MDL No. 2796 CRB (JSC)

**ORDER RE: DEFENDANTS'
MOTIONS TO DISMISS**

     Consumers and auto dealers ("IPPs" and "DPPs," respectively) have filed two related consolidated class actions against the five leading German car manufacturers—Audi AG, BMW AG, Daimler AG, Porsche AG, and Volkswagen ("VW") AG—and their American subsidiaries. Plaintiffs allege that Defendants colluded to restrain competition in violation of the Sherman Act and various state laws. Last June, this Court granted Defendants' joint motion to dismiss without prejudice, concluding that Plaintiffs' allegations were insufficient to state a claim. IPPs and DPPs both filed amended complaints. IPPs have narrowed their focus, zeroing in on an alleged agreement to standardize the dosage rate and tank sizes for the substance AdBlue. DPPs continue to allege a broad conspiracy, now styled as a "no arms race" agreement to divide market share by limiting brand differentiation and technical innovation. Neither effort is sufficient to plead Sherman Act violations or Plaintiffs' related state law claims. Both complaints are dismissed without prejudice.

**I.     BACKGROUND**

     On June 17, 2019, this Court granted without prejudice Defendants' initial joint motion to dismiss. <u>See generally</u> Order re MTD (dkt. 387). The initial consolidated complaints alleged that

Defendants agreed to "slow[ ] down the pace of innovation," reducing the quality of their cars.  Id. at 1–2.  But Plaintiffs provided only two specific examples.  The first was an alleged agreement that soft-top convertibles should only open or close at speeds under thirty-one miles per hour.  Id. at 2.  The second example was a series of alleged agreements on the size of AdBlue tanks (AdBlue is a substance that breaks emissions from diesel engines down into less harmful compounds).  Id. at 2–3.  These allegations (like many in the initial complaints) were based on reports of investigations by the European Commission's competition department ("ECC") and Germany's Federal Cartel Office into a possible antitrust cartel among Defendants.  Id. at 3.  Plaintiffs also relied on VW and Daimler's proffers to the ECC as part of that agency's leniency program.  Id.  VW's proffer admitted agreements amongst the defendants about vehicle development, costs, suppliers and markets, discussions about vehicle development, "exchange of . . . sensitive technical data," jointly established "technical standards" and agreements to use "only certain technical solutions," and the possibility that Defendants' actions may have violated cartel law.  Id.

This Court rejected Plaintiffs' allegations of a "'de facto whole car conspiracy' to reduce innovation."  Id. at 13.  It concluded that the two actual examples of agreement "relate[d] to niche vehicle features" and could not support Plaintiffs' theory of a conspiracy to reduce innovation across the board.  Id.  It also rejected the significance of VW and Daimler's proffers to European antitrust authorities, finding the admissions "too general and too vague to plausibly support the broad agreement to reduce innovation that Plaintiffs allege."  Id. at 13–15.  The investigations by European antitrust authorities were also unhelpful, because it was "unknown whether the investigation[s] w[ould] result in indictments or nothing at all."  Id. at 15 (citing In re Graphics Processing Units Antitrust Litig., 527 F. Supp. 2d 1011, 1024 (N.D. Cal. 2007).  Similarly, "[a]llegations about how Defendants used working groups and trade associations to further their 'whole car conspiracy'" lacked crucial details such as "what was agreed to in these meetings."  Id.

This Court rejected several other alleged agreements as inadequately pled.  Relevant here, it concluded that Plaintiffs had not adequately alleged injury from a purported agreement to "coordinate . . . purchases of car parts and steel," because such an agreement was most likely to have lowered the cost of steel and therefore the prices paid by Plaintiffs.  Id. at 17–18 (citing

Thomas A. Piraino, Jr., A Proposed Antitrust Approach to Collaborations Among Competitors, 86 Iowa L. Rev. 1137, 1178 (2001)). Although DPPs alleged they were harmed because "Defendants pocketed the cost savings and did not pass along a single cent to the Dealer Plaintiffs," they failed to allege that Defendants either agreed to "pocket[ ] the cost savings" or that it was otherwise wrongful for them to do so. Id. at 18.

Finally, this Court dismissed IPPs' various state law claims, because "[t]he factual bases and theories of injury for these claims [were] the same as those for the Sherman Act claims." Id. at 19.

Both IPPs and DPPs filed amended complaints. See IPP Compl. (dkt. 391); DPP Compl. (dkt. 392). The IPP Complaint focuses on an alleged decade-long conspiracy to limit the development and implementation of certain features of diesel emissions control systems. IPP Compl. ¶¶ 3–4. It alleges Defendants agreed to standardize the rate at which AdBlue would be used in their diesel vehicles and the size of those vehicle's AdBlue tanks. Id. ¶ 119. These agreements allegedly occurred during various meetings and in follow-up communications between Defendants' managers, beginning in 2006. See, e.g. id. ¶¶ 129–31, 133, 135, 142, 156–57.

As before, IPPs' allegations rely heavily on the ECC's investigation. In particular, IPPs point to an ECC press release, issued after briefing on the previous motions to dismiss, "announcing that it had sent a Statement of Objections to the Defendant parent companies . . . that reflected the ECC's current view that the Defendants had in fact violated antitrust law by participating in a collusive scheme 'to restrict competition on the development of technology to clean the emissions of petrol and diesel vehicles.'" Id. ¶ 150. The Statement of Objections asserts that Defendants "coordinated their strategies" on the size of AdBlue tanks and the rate at which AdBlue would be used in diesel vehicles. Id. The IPP Complaint also relies on Daimler and VW's leniency proffers. See id. ¶¶ 112–13.

The DPP Complaint builds on the alleged AdBlue agreements to plead a "no arms race" conspiracy, whose object was ostensibly to ensure "that Defendants would not compete against each other on certain technological innovations to gain market share against each other." DPP Compl. ¶ 109.

DPPs offer various allegations besides the AdBlue agreements to support the purported "no arms race" conspiracy. They allege additional agreements on parking brakes, convertible tops, and particle filters, id. ¶ 157, and that Defendants' failure to meaningfully invest in electric vehicles is another example of the "no arms race" principle at work, id. ¶ 254. They point to examples of Defendants updating or refreshing similar vehicle lines around the same time as additional evidence of collusion. Id. ¶¶ 199–200.

The DPP Complaint also expands on the previously alleged steel-purchasing agreement. DPPs describe a scheme in which Defendants negotiated a baseline price with steel producers and then agreed to a standardized purchase price index on top of the baseline, which accounted for fluctuations in the cost of raw materials. Id. ¶ 161.

DPPs also allege that Defendants prevented dealerships from differentiating their vehicles based on price by setting the highest possible retail price (the MSRP) unusually close to the lowest possible retail price (the inventory price). Id. ¶¶ 204–11. The DPP Complaint alleges that additional economic evidence, including pricing information and Defendants' relative market shares over time, demonstrates the existence of a successful market allocation conspiracy. Id. ¶¶ 192–98. Finally, DPPs point to various "plus factors" that ostensibly establish that Defendants had the motive or opportunity to collude. Id. ¶¶ 181–89.

In the alternative, DPPs allege that the AdBlue agreement, id. ¶ 250, agreement not to develop electric vehicles, id. ¶ 254, and steel-purchasing agreements, DPP Opp'n (dkt. 419) at 5 n.6, each constitute Sherman Act violations regardless of whether the "no arms race" conspiracy is adequately pled.

Defendants jointly moved to dismiss the IPP and DPP Complaint. See Joint MTD (dkt. 409). VW and BMW also filed individual motions to dismiss. See VW MTD (dkt. 411); BMW MTD (dkt. 410).

## II.    LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint may be dismissed for failure to state a claim upon which relief may be granted. Dismissal may be based on either "the

4

lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." Godecke v. Kinetic Concepts, Inc., 937 F.3d 1201, 1208 (9th Cir. 2019). A complaint must plead "enough facts to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 697 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 678.

When evaluating a motion to dismiss, the Court "must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party." Usher v. City of Los Angeles, 828 F.2d 556, 561 (9th Cir. 1987). "[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007).

If a court does dismiss a complaint for failure to state a claim, it should "freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). A court nevertheless has discretion to deny leave to amend due to "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment." Leadsinger, Inc. v. BMG Music Pub., 512 F.3d 522, 532 (9th Cir. 2008) (citing Foman v. Davis, 371 U.S. 178, 182 (1962)).

## III.    DISCUSSION

As explained below, the Amended Complaints fail to plausibly allege any Sherman Act violation that can be traced to a cognizable injury suffered by Plaintiffs. This conclusion is equally fatal for IPPs' state law claims, which depend on the same factual allegations and theories of injury. See Order re MTD at 19. It is therefore unnecessary to consider Defendants' other arguments against the Sherman Act claims, including that those claims are time-barred, Joint MTD at 41–47, and that they are barred by the Foreign Trade Antitrust Improvements Act, id. at

35–41.  It is also unnecessary to address various arguments specific to certain defendants, <u>see generally</u> Volkswagen MTD; BMW MTD, or state law claims, <u>see</u> Joint MTD at 47–54.

### A.     AdBlue Conspiracy

Both IPPs and DPPs allege a conspiracy to standardize certain features related to AdBlue, which ostensibly reduced the quality of Defendants' diesel vehicles.  <u>See</u> IPP Compl. ¶¶ 3–4; DPP Compl. ¶ 250.  This section first addresses whether Plaintiffs adequately allege the existence of agreements related to AdBlue, and then, concluding that they do, analyzes whether those allegations are sufficient to plead claims under the Sherman Act.

### 1.     Whether an agreement is adequately alleged.

Section 1 of the Sherman Act forbids competitors from entering agreements that unreasonably restrain trade.  <u>Leegin Creative Leather Prods., Inc. v. PSKS, Inc.</u>, 551 U.S. 877, 885 (2007).  The Amended Complaints plausibly allege that Defendants agreed on "the rate at which AdBlue pollution treatment solution would be used in their diesel-powered vehicles, as well as the size of the vehicles' AdBlue tanks which determined the range that those vehicles could travel before needing to be refilled with AdBlue."  IPP Compl. ¶ 119.  Both Amended Complaints contain detailed factual allegations describing Defendants' "coordination" of AdBlue dosage rate and tank size, including the content of Defendants' agreements (including direct quotes from allegedly criminal negotiations), <u>see, e.g. id.</u> ¶ 133, the positions of the conspirators within Defendants' corporate hierarchies, <u>see, e.g. id.</u> ¶ 135, and where and when the agreements were made, <u>see, e.g. id.</u> ¶¶ 130–31; <u>see also</u> DPP Compl. ¶¶ 111–39.  "[W]ho, did what, to whom (or with whom), where, and when" is adequately alleged.[1]  <u>In re Musical Instruments & Equip. Antitrust Litig.</u>, 798 F.3d 1186, 1194 n.6 (9th Cir. 2015) (quoting <u>Kendall v. Visa U.S.A., Inc.</u>,

---

[1]  The Amended Complaints also allege various "plus factors" ostensibly supporting their allegations of unlawful anticompetitive conduct.  <u>See</u> IPP Compl. ¶ 176; DPP Compl. ¶ 181.  Because Plaintiffs plead direct evidence of agreements on AdBlue-related features, it is unnecessary to evaluate whether the plus factors, when combined with parallel conduct, would adequately allege the existence of such collusion.  <u>See</u> <u>B&R Supermarket, Inc. v. Visa, Inc.</u>, No. 16-01150 WHA, 2016 WL 5725010, at *6 (N.D. Cal. Sept. 30, 2016) ("An impermissible conspiracy can be alleged through either direct or circumstantial evidence.").  The plus factors' relevance vis a vis other alleged anticompetitive agreements is discussed below.

6

518 F.3d 1042, 1047 (9th Cir. 2008)).

Plaintiffs argue that these allegations are supported by the ECC's Statement of Objections, which concluded that "Defendants coordinated their strategies on the amount of pollution treatment solution (such as AdBlue) that would be used in diesel-powered German Diesel Vehicles, as well as the size of the vehicles' AdBlue tanks and the range the vehicles could travel before needing to be refilled with AdBlue." IPP Compl. ¶ 150. Defendants contest the relevance of the Statement of Objections, pointing out that this Court has previously recognized government investigations typically "carry 'no weight in pleading an antitrust conspiracy,' for it is 'unknown whether the investigation[s] will result in indictments or nothing at all.'" See Order re MTD at 15 (quoting In re Graphics Processing Units Antitrust Litig., 527 F. Supp. 2d 1011, 1024 (N.D. Cal. 2007)). Plaintiffs respond that they are now relying on the ECC's Statement of Objections, which is comparable to an indictment. IPP Opp'n at 13–14.

It is unnecessary to determine the significance of the Statement of Objections in this proceeding. Even assuming, without deciding, that the analogy to an indictment is sound, and that an indictment is more significant than a mere investigation, the Statement of Objections adds little to Plaintiffs' case. It establishes agreements on AdBlue tank size and dosing rates. But as explained above, those agreements are already established by Plaintiffs' other well-pled factual allegations. And while the Statement of Objections may support the conclusion that those agreements violated European cartel law, what matters here is whether Plaintiffs' have met the requirements for pleading a violation of the Sherman Act.[2] That requires more than pointing to the findings of European authorities regarding European law. Similarly, it remains the case that Daimler and Volkswagen's leniency applications "are too general and too vague" to plausibly allege that those defendants violated American law. See id. at 13–15.

While the AdBlue agreements are plausibly alleged, Plaintiffs do not adequately plead the existence of a broader conspiracy "to restrict the development of [Defendants'] vehicles' diesel emissions control systems and not to compete on quality." IPP Opp'n at 16. Although this

_____

[2] These requirements include showing either a per se Sherman Act violation or satisfying the rule of reason. See infra Section III.A.2.

purported conspiracy is narrower than a "'de facto whole car conspiracy' to reduce innovation," Order re MTD at 12, it remains broader than the Amended Complaints' well-pled allegations can support. Every agreement alleged with any amount of detail dealt with AdBlue tank size and dosing rate. See IPP Compl. ¶¶ 119–42; DPP Compl. ¶¶ 102–09, 116–36, 139. Just as agreements on convertible roofs and AdBlue tanks could not plausibly support a "whole car" conspiracy, see Order re MTD at 12–13, agreements on AdBlue tank size and dosing rate alone do not plausibly support the existence of a broader conspiracy covering Defendants' entire diesel emissions control system.

It is therefore necessary to determine whether the allegations of an AdBlue conspiracy adequately state a Sherman Act claim. They do not, because Plaintiffs have failed to plead facts showing that the AdBlue agreements were an unreasonable restraint on competition.

> **2.**     **Whether Plaintiffs adequately allege that the AdBlue agreements constituted an unreasonable restrain on trade in violation of the Sherman Act.**

Two forms of analysis may be applied to determine whether a restraint on trade is unreasonable. "The rule of reason is the presumptive or default standard, and it requires the antitrust plaintiff to 'demonstrate that a particular contract or combination is in fact unreasonable and anticompetitive.'" California ex rel. Harris v. Safeway, Inc., 651 F.3d 1118, 1132–33 (9th Cir. 2011) (quoting Texaco Inc. v. Dagher, 547 U.S. 1, 5 (2006)). "Some types of restraints, however, have such predictable and pernicious anticompetitive effect, and such limited potential for procompetitive benefit, that they are deemed unlawful per se." State Oil Co. v. Khan, 522 U.S. 3, 10 (1997). Per se treatment is reserved for conduct that is "manifestly anticompetitive" and without "any redeeming virtue." Leegin, 551 U.S. at 886. "The Supreme Court has 'expressed reluctance to adopt per se rules where the economic impact of certain practices is not immediately obvious.'" Safeway, 651 F.3d at 1133 (quoting Dagher, 547 U.S. at 5).

IPPs argue the AdBlue agreements constitute a per se Sherman Act violation, because an agreement to reduce quality is tantamount to output reduction. IPP Opp'n at 28–29. This Court's

previous order endorsed the logic of this theory, though not its underlying assumption that the AdBlue agreements necessarily constituted agreements to reduce quality.  Order re MTD at 12.  In the alternative, IPPs suggest that even if "Defendants' misconduct does not fit into established per se categories," it is of a type which "always or almost always tend[s] to restrict competition and decrease output."[3]  IPP Opp'n at 29.

These arguments fail, because it is not "immediately obvious" that the AdBlue agreements had an exclusively anticompetitive impact.  Safeway, 651 F.3d at 1133.  As this Court recognized in its previous order, an agreement to use only certain technical solutions may have procompetitive benefits, even if it reduces a product's quality in other respects.  Order re MTD at 14.  For example, standard setting may "serve[ ] . . . useful ends, such as protecting consumers from inferior goods, increasing compatibility among products that must be interchangeable with the products of other manufacturers, or focusing customer comparison on essential rather than nonessential differences."  Id. (internal quotations and citations omitted).  Similarly, "[c]ollaboration for the purpose of developing and commercializing new technology can result in economies of scale and integrations of complementary capacities that reduce costs, facilitate innovation, eliminate duplication of effort and assets, and share risks that no individual member would be willing to undertake alone."  Princo Corp. v. Int'l Trade Comm'n, 616 F.3d 1318, 1335 (Fed. Cir. 2010).  Because procompetitive effects are possible, per se treatment is inappropriate for joint ventures and standard setting.  See Leegin, 551 U.S. at 886.

This logic applies to the alleged AdBlue agreements.  The well-pled allegations in the Amended Complaints describe agreements to abide by certain technical standards and adopt the same or similar technical solutions.  Plaintiffs' effort to transmogrify those agreements into output restrictions or pricing agreements is strained.  See, e.g. IPP Compl. ¶ 5.  And their argument that the standard setting and joint venture cases are inapplicable because the alleged conspiracy does not resemble other standard setting organizations, see IPP Opp'n at 27–28; DPP Opp'n at 10–11, misses the point.  Defendants do not need to demonstrate that the alleged misconduct fell into a

_____

[3]  DPPs do not offer an independent argument for treating the AdBlue agreement as per se unlawful.  See DPP Opp'n at 17–18.

narrow category of behavior governed by the rule of reason. The opposite is true—per se treatment is reserved for narrowly defined categories of collusion that clearly have no redeeming virtues. Leegin, 551 U.S. at 886. The question is not whether the alleged AdBlue conspiracy resembles other standard setting groups. It is whether its anticompetitive economic impact is so obvious that this type of coordination should be per se illegal. Dagher, 547 U.S. at 5.

The Amended Complaints' own allegations demonstrate that the answer to that question is no, because the AdBlue agreements may have had procompetitive effects. Plaintiffs acknowledge that the standards Defendants agreed to were beneficial in some respects. Having fewer AdBlue injections reduced engine clogging and the risk of damage to the vehicle. IPP Compl. ¶ 155. Smaller AdBlue tanks took up less space, leaving more room for other features. DPP Compl. ¶ 115. True, Plaintiffs also plead that these benefits came at a cost—increased NOx emissions. See id. ¶ 115. But Plaintiffs' own allegations demonstrate that the trade-off did not necessarily result in vehicles of inferior quality. Defendants may have agreed to a standard that they believed would ultimately benefit all consumers. This is not to say that the agreements necessarily improved the quality of Defendants' diesel vehicles or were clearly not unreasonable. It simply demonstrates that whether the agreements were reasonable or not should be assessed under the rule of reason.

And, contrary to Plaintiffs' position, which framework to apply can be determined at the pleading stage. It is true that in some cases courts have concluded that which framework applied was a fact-bound determination that could not be determined on the pleadings. See Kamakahi v. Am. Soc'y for Reprod. Med., No. C 11-cv-01781, 2013 WL 1768706, at *8 (N.D. Cal. Mar. 29, 2013). But as with any other claim, a Court can determine that a complaint fails to adequately allege a per se violation of the Sherman Act. See, e.g. Analogix Semiconductor, Inc. v. Silicon Image, Inc., No. C 08-2917 JF (PVT), 2008 WL 8096149, at *1, *4 (N.D. Cal. Oct. 28, 2008) (determining, on a motion to dismiss, that rule of reason analysis applied). That is the case here, because Plaintiffs' own allegations contradict their assertion that the AdBlue agreements necessarily lacked any procompetitive effect. It is therefore appropriate to consider whether Plaintiffs have adequately asserted Sherman Act claims under the rule of reason.

They have not.  The rule of reason requires Plaintiffs to "plead a relevant market" impacted by Defendants' anticompetitive conduct.  <u>Hicks v. PGA Tour, Inc.</u>, 897 F.3d 1109, 1120 (9th Cir. 2018).  A relevant market "include[s] both a geographic market and a product market."  <u>Id.</u>  The product market "must encompass the product at issue as well as all economic substitutes for the product."  <u>Id.</u> (quoting <u>Newcal Indus., Inc. v. Ikon Office Solution</u>, 513 F.3d 1038, 1045 (9th Cir. 2008)).  Economic substitutes are the goods and services that have "reasonable interchangeability of use" or "cross-elasticity of demand" with the product in question.  <u>Id.</u> (quoting <u>Newcal</u>, 513 F.3d at 1045).  This standard ensures that the relevant market includes all "sellers or producers who have actual or potential ability to deprive each other of significant levels of business."  <u>Id.</u> (quoting <u>Newcal</u>, 513 F.3d at 1045).  Failure to plead a relevant market is grounds to dismiss.  <u>Id.</u>

Submarkets may "constitute product markets for antitrust purposes" if they are "economically distinct from the general product market."  <u>Id.</u> at 1121 (internal citations omitted). "[I]ndustry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors" may all indicate an economically distinct submarket.  <u>Id.</u> (internal citations omitted).

A plaintiff who successfully pleads a relevant market must also allege "that the defendant has power within that market."  <u>Newcal</u>, 513 F.3d at 1044–45.  Once a relevant market has been pled, market power can be demonstrated by evidence "that the defendant owns a dominant share of [the relevant] market" and "that there are significant barriers to entry and . . . existing competitors lack the capacity to increase their output in the short run."  <u>Id.</u>  Alternatively, "direct evidence of the injurious exercise of market power," such as "supracompetitive prices" and "restricted output," may be an adequate substitute for "elaborate market analysis."  <u>FTC v. Indiana Fed. of Dentists</u>, 476 U.S. 447, 461 (1986).

Plaintiffs efforts to plead a relevant market are facially deficient.  IPPs do not argue that they have pled a relevant product market, <u>see</u> IPP Opp'n at 29, nor could they.  To the extent the IPP Complaint suggests that "German Diesel Vehicles" are a cognizable submarket, that suggestion is belied by IPPs' own allegations that Defendants were driven to collude on "clean

diesel" technology by competition from Japanese hybrids.  IPP Compl. ¶ 84; see also Apple Inc. v. Psystar Corp., 586 F. Supp. 2d 1190, 1199 (N.D. Cal. 2008) (complaint that acknowledged that Apple computers running Mac OS faced competition, but which did not include those competitors in its market definition or explain why they should be excluded, failed to plead a relevant market).

DPPs' efforts suffer similar flaws.  Their complaint alleges a submarket of "German Luxury Vehicles."  DPP Compl. ¶¶ 69–80.  But again, that claim is belied by DPPs' own allegations, which acknowledge that Defendants competed with Italian, American, and Japanese brands.  See DPP Compl. ¶¶ 80, 95, 130–32, 164.  And even if DPPs' own allegations did not undermine their theory, "judicial experience and common sense" would.  See Hicks, 897 F.3d at 1121.  Non-German luxury cars exist (Tesla, Lexus, and Maserati all come to mind).  It is implausible that national origin alone puts German automakers in a separate market from their high-end foreign rivals, or that a buyer looking at a Mercedes would not consider a Tesla if it were cheaper or of higher quality.  DPPs rely on a supposed price premium for German cars, see DPP Compl. ¶ 72, but a price differential alone is insufficient to establish an economically distinct submarket.  Psystar Corp., 586 F. Supp. 2d at 1199.  And if anything, German automakers attempts to set themselves apart with advertising demonstrate that they were competing with non-German luxury brands.  See id. ("[V]igorous advertising is a sign of competition, not a lack thereof."); see also DPP Compl. ¶ 75.

In the alternative, DPPs allege a more plausible submarket of luxury vehicles.  DPP Compl. ¶ 80 n.15.  But these allegations fail for a different reason: DPPs have not alleged facts to support a finding that Defendants have market power in the luxury car market writ large.  The only evidence they offer in support of this claim is their estimate that Defendants enjoy approximately a 50% share "of the broader luxury car market."  DPP Opp'n at 23 n.17.  But "[c]ourts generally require a 65% market share to establish a prima facie case of market power."  Image Tech. Servs., Inc. v. Eastman Kodak Co., 125 F.3d 1195, 1206 (9th Cir. 1997).

Nor have DPPs "alleged actual adverse effects," see DPP Opp'n at 23 n.17, that would excuse their failure to show a relevant market and market power.  DPPs do not support this claim with any citation to the allegations in their complaint, so it is unclear what actual adverse effects

they believe they have alleged.  <u>See id.</u>  To the extent DPPs argue that the AdBlue agreements were tantamount to price fixing or output restrictions, those claims are inadequately alleged for the same reasons that Plaintiffs have failed to plead a per se Sherman Act violation.

The failure to plead a relevant market is fatal to Plaintiffs' contention that the AdBlue agreements state a cognizable Sherman Act claim.  It is equally fatal to DPPs' alternative theories of liability, which fail to plausibly allege per se Sherman Act violations for the reasons explained below.  Indeed, DPPs' other allegations of anticompetitive agreements fail for an additional reason besides the failure to plead a relevant market.  DPPs fail to plausibly allege either the existence of or injury from those agreements.

### B.  "No Arms Race" Conspiracy

DPPs allege that "[t]he operating principle of [Defendants'] conspiracy was 'no arms race,' which was a euphemism for avoiding competition for market share on the basis of technological developments and brand differentiation."  DPP Compl. ¶ 10.  This theory fails for the same reason as its very similar predecessor, the "whole car conspiracy" rejected by this Court in its previous order.  <u>See</u> Order re MTD at 12–17.  Once again, DPPs attempt to plead a broad conspiracy with untenably narrow allegations.  This Order proceeds by explaining why each of DPPs' several categories of allegations fails to plausibly demonstrate a "no arms race" conspiracy, even when considered as a whole.

### 1.  Agreements to limit technological innovation.

DPPs' chief evidence of the "no arms race" conspiracy is the AdBlue agreement discussed above.  The Court previously rejected agreements on AdBlue tank size as insufficient to plead a similarly broad "<u>de facto</u> whole car conspiracy," even in combination with a second example of collusion on technical standards.  <u>Id.</u> at 13.  DPPs offer no real argument for a different result here. Their position is that they do not need to "argue that all, or even most, of the class vehicles' components and features were subject to the conspiracy," because they "contend that Defendants refrained from innovating or improving features on the class vehicles in such a way that their respective market shares would remain the same."  DPP Opp'n at 10.  But DPPs' Complaint and

briefing offer no explanation for why an agreement to standardize what the Court has previously described as a "niche vehicle feature[ ]" would be adequate to maintain each Defendants' market share.  Order re MTD at 13.

DPPs suggest Defendants reached agreements on several other vehicle features, such as "particulate filters, convertible roofs, and parking brakes."  DPP Compl. ¶ 157.  Most of these allegations lack any detail at all.  The DPP complaint does not allege what was agreed to regarding parking brakes, who agreed to it, or when and where such an agreement took place.  And it alleges only that Defendants agreed they would not allow convertible roofs to open and close at speeds above thirty-one miles per hour, an allegation the Court has previously rejected as insufficient to plead a broad "whole car" conspiracy, even combined with allegations of the AdBlue agreements. Order re MTD at 13.

Only the agreement on particle filters is supported by any factual allegations regarding "who, did what, to whom (or with whom), where, and when."  See In re Musical Instruments, 798 F.3d at 1194 n.6.  DPPs allege that "[b]eginning in 2009, Defendants also entered into agreements to avoid, or at least to delay, the introduction of particle filters in their new (direct injection) gasoline passenger car models between 2009 and 2014."  DPP Compl. ¶ 137.  But DPPs admit these "filters were used predominantly in passenger vehicles sold in Europe."  Id. ¶ 137 n.68.  The alleged agreement on an additional niche feature predominantly used in cars irrelevant here does not plausibly support the existence of a conspiracy meant to divide the American market into static shares.

### 2.    Steel-buying conspiracy.

DPPs allege that Defendants unlawfully agreed not to compete for the lowest price on steel.  DPP Compl. ¶¶ 158–65.  Even assuming the existence of an unlawful conspiracy regarding steel prices, this allegation does little to support the "no arms race" theory.[4]  DPPs insist that by avoiding competition on the cost of steel, Defendants helped ensure their respective shares of the

---

[4]  Whether the steel-buying conspiracy can stand as its own Sherman Act violation is discussed below.

14

market would remain static.  Id. ¶ 165.  Just as it is implausible to infer that standardizing a few niche technical features would enable Defendants to keep their respective market shares stable, it is unlikely that adopting similar formulas for the price of a single raw material (albeit an important one) would be enough to keep shares of the American market in an agreeable equilibrium.  The leap from steel prices to overall market allocation is not "plausible on its face," even considered alongside DPPs' other allegations.  See Twombly, 550 U.S. at 570.

### 3. Electric cars.

As explained in greater detail below, the alleged conspiracy to avoid developing electric vehicles has an obvious innocent explanation posited by the DPP Complaint itself.  And DPPs do not even allege that all Defendants' conduct was parallel with respect to this alleged conspiracy.  See infra Section III.C.  These allegations add little or nothing to the "no arms race" conspiracy.

### 4. Parallel conduct.

Other allegations amount to little more than parallel conduct with obvious innocuous explanations.  DPPs' allege that Defendants "coordinated major product updates and refreshes," and provide three examples of similar product lines being updated or refreshed within a year or two of each other.  DPP Compl. ¶ 199–200.  But as Defendants point out, the fact that they all released new products at similar times tends to suggest that they were competing with each other, rather than the opposite.  Joint Reply (dkt. 425) at 10; see also In re Musical Instruments, 798 F.3d at 1193 ("In an interdependent market, companies base their actions in part on the anticipated reactions of their competitors.").  Allegations that Defendants' prices remained mostly constant relative to each other is equally uninformative, DPP Compl. ¶ 194–98, because firms may lawfully set prices in reaction to their competitors, In re Musical Instruments, 798 F.3d at 1193.

Relatedly, DPPs claim that "Defendants prevented dealers from using sales price to upset the status quo."  DPP Opp'n at 11.  Their complaint explains that Defendants set their vehicles' maximum price (the MSRP) and minimum price (the inventory price) unusually close together, reducing variation in the final sales price.  DPP Compl. ¶¶ 204–11.  DPPs do not claim that such "manipulation," standing alone, would be unlawful, and in fact acknowledge that "[u]nder the

15

automotive franchise system, Defendants have absolute and sole control over [wholesale] prices" and the MSRP. Id. ¶¶ 205, 210. But the DPP Complaint also does not allege any unlawful collusion in setting wholesale prices and MSRPs, other than a half-hearted claim that it is "highly likely that the manufacturers coordinated the setting of dealer wholesale prices and MSRP." Id. at 204. Apparently, this is because all Defendants set wholesale prices and MSRPs unusually close together and stood to benefit from the thin margins. See id. ¶¶ 207–09, 211. But parallel pricing alone does not demonstrate collusion, even (or especially) when market participants stand to benefit from reacting to each other's decisions or "similar market pressures." In re Musical Instruments, 798 F.3d at 1193.

Because the parallel conduct alleged in the DPP Complaint could just as easily (or even more plausibly) reflect legitimate conscious parallelism as opposed to collusion, it does not support their "no arms race" theory. Id. at 1194 ("Allegations of facts that could just as easily suggest rational, legal business behavior by the defendants as they could suggest an illegal conspiracy are insufficient to plead a § 1 violation." (internal quotation marks and citations omitted)).

### 5. Plus factors.

Nor is this a case where "plus factors . . . inconsistent with unilateral conduct" can push DPPs' otherwise inadequate allegations over the line. See id. ("This court has distinguished permissible parallel conduct from impermissible conspiracy by looking for certain 'plus factors.'"). Most of DPPs' plus factors go either to Defendants' alleged "strong motive to conspire" or the susceptibility of the relevant market to collusion. See DPP Compl. ¶¶ 182, 185–89. The Ninth Circuit has rejected comparable arguments, noting that "alleging 'common motive to conspire' simply restates that a market is interdependent (i.e., that the profitability of a firm's decisions regarding pricing depends on competitors' reactions)." Musical Instruments, 798 F.3d at 1194–95. "Interdependence, however, does not entail collusion, as interdependent firms may engage in consciously parallel conduct through observation of their competitors' decisions, even absent agreement." Id. at 1195. DPPs' allegations that the market was susceptible to collusion or

gave Defendants a motive to conspire reduce to allegations that the market is interdependent,[5] and are therefore of little help in pleading an antitrust conspiracy.  See DPP Compl. ¶¶ 182, 185–89.

DPPs allege that "Defendants had and took advantage of literally thousands of opportunities to conspire through secret meetings" and during trade meetings.  DPP Compl. ¶ 183. This Court has previously rejected the significance of similar allegations because Plaintiffs failed to "identify what was agreed to in the[ ] meetings."  Order re MTD at 16.  Once again DPPs do not allege what was agreed to during the alleged meetings, see DPP Compl. ¶ 183, aside from the purported collusion on certain niche features discussed above.

Defendants' ostensible actions against self-interest are similarly redundant of the insufficient allegations of agreement.  DPPs allege "Defendants engaged in conduct inconsistent with their independent self-interests by, among other things, revealing to each other proprietary technological information and trade secrets."  Id. ¶ 184.  But the only such revelations alleged in any kind of detail would have to be related to the agreements on AdBlue and particle filters. Those agreements do not plausibly establish a "no arms race" conspiracy for the reasons discussed above.

Finally, DPPs allege "economic . . . outcomes" supposedly inconsistent with independent action.  See In re Musical Instruments, 798 F.3d at 1194 (defining "plus factors" as "economic actions and outcomes that are largely inconsistent with unilateral action but largely consistent with explicitly coordinated action").  They allege that Defendants' overall market share grew even as each Defendant's market share remained stable relative to the other alleged conspirators, demonstrating the success of the conspiracy.  DPP Compl. ¶¶ 192–93.  But although DPPs conclusorily state that "[t]he stability of Defendants' market shares is economically consistent

---

[5]  One arguable exception is DPPs' allegation that "commonality of suppliers increased transparency into cost functions of each of the firms within the German Luxury Car Market, providing mechanisms to police the cartel."  DPP Compl. ¶ 185.  Since this allegation goes to the ease of enforcing collusive agreements, rather than the extent to which a firm's pricing decisions will be driven by competitors' behavior, it may be distinguishable from allegations that the market is interdependent.  However, by facilitating "observation of their competitors' decisions," the alleged "transparency" would facilitate "conscious parallelism" by Defendants just as much as unlawful agreement.  See In re Musical Instruments, 798 F.3d at 1195.  This allegation, like others about Defendants' motive or ability to successfully collude, is equally consistent with lawful behavior as an anticompetitive conspiracy.

with the existence of a market allocation agreement," id. ¶ 193, they make no effort to allege that it is inconsistent with conscious parallelism or some other innocent explanation. And they undermine their own argument by acknowledging that the inter-Defendant market was not, in fact, completely static. Id. At best these allegations provide only mild support for DPPs' alleged conspiracy.

In sum, DPPs' narrow allegations of agreements to standardize niche features or prices for steel cannot support the wide-ranging conspiracy they attempt to plead. Additional allegations of parallel conduct and plus factors are too speculative and conclusory to cover the gap.

### C.     Electric Car Conspiracy

In the alternative, DPPs plead a narrower conspiracy not to engage in an arms race to develop electric vehicles. Once again, this parallel conduct is insufficient to support an antitrust claim, because it has a perfectly innocuous explanation. Indeed, that explanation is provided by the DPP Complaint itself. Defendants did not invest in electric vehicles because they "had already invested heavily in diesel engines." DPP Compl. ¶ 112. That suggests it is just as if not more plausible that Defendants "arrive[d] at identical decisions independently, [because] they [were] cognizant of—and reacting to—similar market pressures." In re Musical Instruments, 798 F.3d at 1193.

The plausibility of a conspiracy not to invest in electric vehicles is further undercut by the DPP Complaint's admission that Audi, BMW, and Porsche did produce electric and hybrid vehicles in 2013 and 2014. DPP Compl. ¶ 144. The DPP Complaint tries to reconcile this fact with the claimed conspiracy by alleging that the electric and hybrid vehicles produced were not advanced enough. Id. This simply underscores the weakness of their theory. DPPs are reduced to arguing that Defendants must have unlawfully agreed to underinvest in electric vehicles, because absent such an agreement they would have made a better electric vehicle. Absent direct evidence of agreement, or more robust allegations of plus factors than the ones discussed above, this (barely) parallel conduct cannot support an antitrust claim.

18

### D. Steel-Buying Conspiracy

This Court has previously considered DPPs' allegations that "the five leading German car makers agreed to coordinate their purchases of . . . steel." Order re MTD at 17; see also DPP Compl. ¶¶ 158–65. In its prior order, the Court concluded that even if Defendants had agreed on the price of steel, "the prices they paid for those inputs would presumably have dropped," which "would likely have benefited car purchasers, not harmed them." Order re MTD at 17. DPPs seek to avoid a similar result this time around by alleging that Defendants colluded to pay higher prices, because their goal was to pay the same price for steel as their competitors, even if that meant everyone paid more. According to the DPP Complaint, this allowed Defendants to avoid competing for market share based on steel prices and assured they could pass any price increase on to their customers. DPP Compl. ¶¶ 161–65.

This theory is not supported by DPPs' factual allegations. Those allegations describe a scheme in which each Defendant agreed with the steel manufacturers on a baseline price for steel. DPP Compl. ¶ 161. Additionally, and apparently unlawfully, Defendants agreed to a standardized "purchase price 'index' on top of the baseline price to account for fluctuations in the market for raw materials—this element of the cost was calculated at shorter intervals and, if the index rose or fell, the automobile manufacturers paid more or less, respectively." Id. This arrangement accommodated the steel manufacturers' need to account for short term fluctuations in the cost of raw materials, but also Defendants' desire for a "fixed, predictable [steel] cost[ ]" that would allow them "to set car model prices for the year." Id. ¶ 160.

Other than conclusory claims to the contrary, DPPs never adequately explain why this agreement would raise the prices they paid to Defendants. Although the index price was additional to the baseline price, that does not mean it increased the price Defendants paid for steel. Absent the baseline/index formula, Defendants presumably would have paid a single, higher price that accounted for the cost of raw materials. See id. The July 12, 2018, Bundeskartellamt press release DPPs seek to rely on is unhelpful, because it discusses only the steel manufacturers—it does not even mention Defendants, let alone support the allegation that they agreed to pay higher prices for steel than they would have absent the collusion. See DPP Opp'n at 14 n.10 (citing

Bundeskartellamt, Press Release, <u>Bundeskartellamt imposes first fines totaling approx. 205 million euros on special steel companies</u>, (July 12, 2018) http://tinyurl.com/seeloqn).[6]

Finally, DPPs' allegations that Defendants offset rising steel costs by increasing prices do nothing to support their theory of injury from the alleged agreement on steel purchases. DPP Compl. ¶ 162–65. Notably, DPPs do not allege that the increased prices were caused by Defendants' agreement. To the contrary, they acknowledge that Japanese automobile manufacturers were also impacted by the alleged price increase. <u>Id.</u> ¶ 164.

DPPs allege that Daimler was able to offset higher steel costs by raising prices and that as a group Defendants maintained higher margins than their Japanese competitors. The DPP Complaint concludes these outcomes are inconsistent with any explanation other than collusion. <u>Id.</u> ¶¶ 162–65. But this bare allegation of collusion is belied by the DPP Complaint's factual allegations, which are more consistent with lawful conscious parallelism. DPPs allege that Daimler, discussing its willingness to raise prices, stated that it preferred to "not be the last to move forward on the pricing front, but rather on the other end." <u>Id.</u> ¶ 162. This suggests not an agreement to raise prices, but various firms watching their competitors' pricing decisions and adjusting their own prices in response. This type of "follow the leader" pricing (in which Daimler aspired to be the leader, rather than a follower) is a well-recognized form of lawful conscious parallelism. <u>In re Musical Instruments</u>, 798 F.3d at 1195 ("[S]o long as prices can be easily readjusted without persistent negative consequences, one firm can risk being the first to raise prices, confident that if its price <u>is</u> followed, all firms will benefit.").

In sum, neither more recent press releases nor DPPs' amended pleadings change the Court's earlier conclusion (and DPPs' original contention) that the steel-purchasing agreements, even if unlawful, most plausibly led to lower prices. Order re MTD at 17; <u>see also</u> Original DPP Compl. (dkt. 244) ¶ 87 (alleging that the steel-purchasing agreements created "cost savings"). They have therefore failed to plead an injury resulting from this alleged agreement. <u>See</u> Order re MTD at 17–18 (failure to plead injury resulting from steel-buying agreements meant those

---

[6] Because the Court has reviewed the press release's contents and finds it unhelpful, DPPs' request for judicial notice of this document is denied as moot.

allegations could not support an antitrust claim).

**E. State Law Claims**

This Court has previously concluded that "[t]he factual bases and theories of injury for [IPPs' various state law] claims are the same as those for the Sherman Act claims." Id. at 19. Because the Sherman Act claims were not well pled, the state law claims were dismissed as well. Id. IPPs do not contend that this was error, or that their state law claims should not live and die with their Sherman Act claim. See IPP Opp'n at 41, 43, 46. IPPs' state law claims are therefore dismissed without prejudice.

## IV. CONCLUSION

For the foregoing reasons, the motions to dismiss are granted.[7] It is not a certainty, however, that Plaintiffs cannot allege facts sufficient to plead a relevant market or injury from the alleged steel-buying agreements. The Court thus grants them leave to amend their complaints to attempt to salvage these claims. To the extent that they choose to do so, they must file their amended complaints within **45 days** of this Order.

**IT IS SO ORDERED.**

Dated: March 31, 2020

CHARLES R. BREYER
United States District Judge

---

[7] VW's motion to file under seal (dkt. 412) is also granted.